**W. Ray IRVIN, Jr., Appellant,**

v.

**Loretta PARKER, Appellee.**

No. 2–02–258–CV.

Court of Appeals of Texas,
Fort Worth.

June 17, 2004.

compose

Crampton & Crampton, Barbara C. Crampton, Wichita Falls, TX, for Appellant.

Brooks & Campbell, LLP, C. Dan Campbell, Wichita Falls, TX, for Appellee.

PANEL A: CAYCE, C.J.; HOLMAN and GARDNER, JJ.

## OPINION

ANNE GARDNER, Justice.

This case involves a property dispute between Appellee Loretta Parker, the sister of Noma Bishop Irvin, deceased, in her capacity as the administratrix of Noma's estate, and Appellant Ray Irvin, Noma's widower. Ray appeals the portion of the trial court's judgment ordering Prudential Insurance Company of America to turn over to Loretta the proceeds of an annuity purchased during Ray and Noma's marriage. In four issues, Ray asserts that the evidence is legally and factually insufficient to support the jury's finding that the Prudential annuity was purchased with Noma's separate property funds, and he argues that the trial court erred in admitting a prior pleading as an admission against interest and in charging the jury with respect to the abandoned pleading. We affirm in part and reverse and remand in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Noma owned and inherited substantial property when her first husband Garland Bishop died in 1965. Noma later married Ray in 1968 and remained married to him until her death in May 1998. At the time of Noma's death, her will named her brother-in-law, Bobby Joe Parker as the executor, but it did not name an alternate executor. But because Bobby Joe Parker had died in 1993, Noma's sister, Loretta, applied to be the administratrix of Noma's estate when Noma died. On July 28, 1998, the trial court signed an order admitting Noma's will to probate and appointing Loretta as the will's administratrix.

Under the terms of Noma's will, her estate passed to Loretta, Loretta's siblings, and Loretta's children. On December 11, 1998, Loretta filed a petition to recover property belonging to Noma's estate and requested, among other things, that Ray return two certificates of deposit totaling $70,000 and $75,000 that Loretta alleged were Noma's separate property. Through discovery, Loretta determined that the $75,000 had been used to purchase an annuity from Prudential. On October 18, 1999, Loretta filed a petition against Ray and Prudential, asserting that Ray had taken $75,000 of Noma's separate property, purchased an annuity from Prudential in 1996, made himself the owner of the annuity, and thereby converted Noma's separate property.

On December 17, 2001, Ray, Loretta, and Prudential signed an agreement re-

garding the annuity issued to Ray in 1996. Prudential acknowledged that although Ray claimed he was entitled to the proceeds of the annuity, Loretta likewise claimed that she was entitled to the annuity because she alleged that the annuity was purchased with Noma's separate property. The parties agreed that the claims were adverse and conflicting and would be determined in the pending lawsuit. Prudential further agreed to freeze the annuity and to distribute the annuity and its proceeds only when presented with the trial court's final determination of who was entitled to the funds from the annuity. Loretta then nonsuited Prudential, and Loretta and Ray agreed not to name Prudential as a defendant in the pending lawsuit.

In February 2002, Loretta tried her case against Ray. During trial, Loretta offered evidence that on October 18, 1993, Noma and Ray opened AmWest Savings Association account number 11–136970–0 with a $75,000 deposit. The name on the account was "W. Ray Irvin, Jr. or Noma G. Irvin, Trustees for Loretta Parker." Thomas Barber, who is a certified public accountant, testified for Loretta as a tracing expert and stated that the account was set up as a revocable trust. Barber testified that, on October 19, 1994, Ray withdrew $75,006.98 from AmWest Account No. 11–136970–0 by obtaining a check made payable to "W RAY IRVIN JR OR NOMA G IRVIN TRUSTEES FOR LORETTA PARKER."

On the same day, Noma and Ray opened account number 132700348 at Guaranty Federal Bank, and it was also named "W RAY IRVIN OR NOMA G IRVIN ITF LORETTA PARKER." Barber testified that five days later, on October 24, Ray deposited $75,000 in the Guaranty Federal account. Then, on January 24, 1996, Ray withdrew $75,046.24 from the Guaranty Federal account and purchased the annuity at issue from Prudential Insurance Company.

Purdom Keeling, the Prudential representative who sold Noma and Ray the annuity, testified that he primarily worked with Ray in persuading them to purchase the annuity. Keeling testified that when he sold the annuity, Noma pulled out the checkbook, and Ray signed the check.[1] The Prudential annuity listed Noma and Ray as co-annuitants, Ray as the sole owner of the annuity, and Loretta as the beneficiary, if living, and Ray's estate as the alternate beneficiary.

Ray testified that he and Noma received $500 a month from the Prudential annuity. Ray stated that shortly after Noma's death, the Prudential annuity was garnished, and he was "not getting any good out of it." While he offered no testimony as to the present value of the Prudential annuity at the time of trial, in a portion of Ray's deposition that was read to the jury, Ray estimated the present value of the annuity on February 9, 1999 to be approximately $70,000.

As we discuss more fully below, Loretta and Ray presented competing evidence and arguments as to the origin of the purchase money for the Prudential annuity. Loretta attempted to trace the $75,000 purchase money back to Noma's separate property while Ray offered evidence to suggest that Loretta could not trace the funds back to Noma's separate property

---

**1.** During trial, Loretta offered considerable medical evidence regarding Noma's declining physical and mental health over the last ten years of her life to show that she was dependant on her husband and that she did not fully understand her financial dealings. But Keeling testified that, in his dealings with Noma, he did not see any indication that she was unable to function mentally.

and that the purchase money was presumed to have come from the couple's community estate.

After considering all of the evidence and testimony before it, the jury answered Question One as follows:

Do you find from clear and convincing evidence, that the Prudential Annuity was purchased with separate property funds of Noma Bishop Irvin?

Answer: Yes.

The jury also determined that Noma did not knowingly consent to Ray being the owner of the Prudential annuity on the date of purchase. Based on these findings, the trial court signed a judgment ordering Prudential to turn over the proceeds of the annuity to Noma's estate.[2]

## II. ABANDONED PLEADING

Before turning to Ray's sufficiency complaints, we will address his fourth issue concerning whether the trial court erred in admitting a prior pleading as an admission against interest and by charging the jury on the admission in the abandoned pleading. In Ray's response to Loretta's petition to recover estate property, Ray pleaded, "The C.D. which appears to have been the separate property of Noma was used to purchased [sic] a Prudential annuity (copy attached)."

■ When Loretta offered the abandoned pleading at trial, the court conducted a bench conference concerning its admissibility. At the conclusion of the conference, both sides agreed that the abandoned pleading was admissible for a limited purpose, and Ray stated that he had "[n]o objection" to the abandoned pleading's admission. *See generally Long v. Knox*, 155 Tex. 581, 291 S.W.2d 292, 294 (1956) ("[A]n admission against interest in an abandoned pleading may be used in evidence against the pleader, but is not conclusive."); *Kirk v. Head*, 137 Tex. 44, 152 S.W.2d 726, 729 (1941); *Hughes v. Fort Worth Nat'l Bank*, 164 S.W.2d 231, 232 (Tex.Civ.App.-Fort Worth 1942, writ ref'd). Because Ray withdrew his objection to the admissibility of the abandoned pleading and therefore did not obtain a ruling from the trial court concerning the issue that he now raises on appeal, we conclude that Ray waived his complaint concerning the admissibility of his abandoned pleading.[3] TEX.R.APP. P. 33.1(a); *see also* TEX.R. EVID. 103(a)(1); *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex.1991) (op. on reh'g).

■ Further, we hold that Ray failed to preserve any error with respect to the abandoned pleading jury instruction because he did not object to the charge concerning that instruction. *See* TEX.R. CIV. P. 274 ("Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections."); *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 239–41 (Tex.1992); *Wilgus v. Bond*, 730

---

2. The trial court's judgment also disposes of other property, but Ray's appeal concerns only the portion of the judgment pertaining to the Prudential annuity.

3. In fact, after Ray's counsel asked the trial court to explain to the jury the circumstances surrounding the limited admissibility of the abandoned pleading, Ray's counsel added to the trial court's and Loretta's counsel's explanations, stating in open court, "And I believe, your Honor, that the case—that while that might be admitted, it's not conclusive evidence." The trial court responded, "Correct." Thus, even if we determined that Ray did not waive any error in the abandoned pleading's admission, it could be argued that Ray invited the error of which he now complains. *See Gen. Chem. Corp. v. De La Lastra*, 852 S.W.2d 916, 920 (Tex.1993).

S.W.2d 670, 672 (Tex.1987). Accordingly, we overrule issue four.

### III. SUFFICIENCY OF THE EVIDENCE

In his first three issues, Ray challenges the legal and factual sufficiency of the evidence to support the jury's finding in question one that the Prudential annuity was purchased with Noma's separate property funds. Specifically, Ray maintains that Loretta failed to trace the money used to purchase the annuity back to Noma's separate property and thereby failed to overcome the presumption that, at the time of Noma's death, the Prudential annuity was included in the community estate. *See* Tex. Fam.Code Ann. § 3.003(a) (Vernon 1998). We agree.

#### A. Characterization of Property

■■ Property possessed by either spouse during or on the dissolution of marriage is presumed to be community property. *Id.; Boyd v. Boyd,* 131 S.W.3d 605, 612 (Tex.App.-Fort Worth 2004, no pet.); *Evans v. Evans,* 14 S.W.3d 343, 346 (Tex. App.-Houston [14th Dist.] 2000, no pet.). This presumption applies not only to dissolution by divorce, but also by death. *Lee v. Lee,* 43 S.W.3d 636, 641 (Tex.App.-Fort Worth 2001, no pet.); *Evans,* 14 S.W.3d at 346; *Smith v. Lanier,* 998 S.W.2d 324, 331 (Tex.App.-Austin 1999, pet. denied). To overcome this presumption, a party claiming certain property as separate property must establish by clear and convincing evidence the separate character of the property through tracing. Tex. Fam.Code Ann. § 3.003(b); *Boyd,* 131 S.W.3d at 612 (citing *McElwee v. McElwee,* 911 S.W.2d 182, 188 (Tex.App.-Houston [1st Dist.] 1995, writ denied)); *Evans,* 14 S.W.3d at 346.

■■ Separate property will retain its character though a series of exchanges so long as the party asserting separate ownership can overcome the community presumption by tracing the assets on hand during the marriage back to property that, because of its time and manner of acquisition, is separate in character. *Cockerham v. Cockerham,* 527 S.W.2d 162, 167 (Tex. 1975); *Boyd,* 131 S.W.3d at 612 ("Tracing involves establishing the separate origin of the property through evidence showing the time and means by which the spouse originally obtained possession of the property."); *Evans,* 14 S.W.3d at 346. On the other hand, if the evidence shows that separate and community property have become so commingled as to defy resegregation and identification, the community presumption prevails. *Boyd,* 131 S.W.3d at 612. As a general rule, mere testimony that property was purchased with separate funds, without any tracing of the funds, is insufficient to rebut the community presumption. *Id.* (citing *Zagorski v. Zagorski,* 116 S.W.3d 309, 316 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) (op. on reh'g)). We resolve any doubt as to the character of property in favor of the community estate. *Id.* (citing *Akin v. Akin,* 649 S.W.2d 700, 703 (Tex.App.-Fort Worth 1983, writ ref'd n.r.e.)).

■ While the burden of tracing is difficult, it is not an impossible burden to sustain. *Id.; Latham v. Allison,* 560 S.W.2d 481, 484 (Tex.Civ.App.-Fort Worth 1977, writ ref'd n.r.e.). "Whether the presumption as to the community character of marital property is overcome is a question for the jury." *Lanier,* 998 S.W.2d at 332 (citing *Orrill v. Orrill,* 271 S.W.2d 173, 175–76 (Tex.Civ.App.-Texarkana 1954, no writ)).

#### B. Standards of Review

■■ Because the burden of proof at trial was clear and convincing evidence, on appeal we apply higher standards of legal and factual sufficiency review than is ordi-

narily employed in civil cases. TEX. FAM. CODE ANN. § 3.003(b); *In re J.F.C.,* 96 S.W.3d 256, 265–66 (Tex.2002); *In re C.H.,* 89 S.W.3d 17, 25–26 (Tex.2002); *Boyd,* 131 S.W.3d at 611; *Zagorski,* 116 S.W.3d at 313–14. In reviewing the evidence for legal sufficiency, we must determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction" that the separate property characterization was proven. *J.F.C.,* 96 S.W.3d at 265–66. We must review all the evidence in the light most favorable to the finding and judgment. *Id.* at 266. This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. *Id.* We must also disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We must consider, however, undisputed evidence even if it does not support the finding. *Id.*

### C. Application of Law to the Facts

■ We begin with the presumption that the $75,000 used to purchase the Prudential annuity is properly characterized as community property. *See* TEX. FAM. CODE ANN. § 3.003(a); *Boyd,* 131 S.W.3d at 612; *Evans,* 14 S.W.3d at 346. Loretta argues that she overcame the community presumption by establishing with clear and convincing evidence the separate character of the annuity's funds through tracing. *See* TEX. FAM.CODE ANN. § 3.003(b); *Boyd,* 131 S.W.3d at 611–12; *Evans,* 14 S.W.3d at 346; *McElwee,* 911 S.W.2d at 189. For the following reasons, we disagree.

Loretta first points out that Ray did not object to the inventory, appraisement, and list of claims she filed on behalf of Noma's estate, and which was approved by the trial court, that listed a claim against Ray for $75,000 "for conversion of separate property funds of Noma Bishop Irvin which were used by W. Ray Irvin, Jr. to purchase [the Prudential annuity]." She argues that although the approval of an inventory and appraisement is not conclusive of the title to the property listed in such, it is prima facie proof of that fact. *See Krueger v. Williams,* 163 Tex. 545, 359 S.W.2d 48, 50 (1962); *Garner v. Long,* 106 S.W.3d 260, 266 (Tex.App.-Fort Worth 2003, no pet.); *see also Robles v. Robles,* 965 S.W.2d 605, 620–21 (Tex.App.-Houston [1st Dist.] 1998, pet. denied) (op. on reh'g) (stating that inventory is not conclusive evidence of property's character); *Balaban v. Balaban,* 712 S.W.2d 775, 779 (Tex. App.-Houston [1st Dist.] 1986, writ ref'd n.r.e.) (stating that "county court cannot change ownership of property by simply approving an inventory," which is not conclusive evidence of title).

■ Next, Loretta argues that the jury could have considered Ray's abandoned pleading, in which he pleaded in pertinent part: "The C.D. which appears to have been the separate property of Noma was used to purchased [sic] a Prudential annuity (copy attached)." We first observe that Ray qualified his admission against interest in his abandoned pleading by stating that the Prudential annuity was purchased with property that "appear[ed] to have been" Noma's separate property. Moreover, as we stated above, while an admission against interest in an abandoned pleading may be used in evidence against the pleader, it is not conclusive of the fact asserted. *See Knox,* 155 Tex. 581, 291 S.W.2d at 294; *Kirk,* 137 Tex. 44, 152 S.W.2d at 729; *Hughes,* 164 S.W.2d at 232.

Loretta also argues that the jury heard Ray repeatedly admit in his deposition that the money used to purchase the Prudential annuity was Noma's. Loretta directs us to portions of Ray's deposition testimony, in which he was asked whose $75,000 was used to buy the annuity, and Ray responded, "It was Noma's money."

But Ray denied knowing that she had inherited the $75,000 used to purchase the Prudential annuity. Ray stated, "I don't know about inherited," but said, "It was hers, and that's acknowledged." Even assuming that this testimony may be interpreted as referring to the money used to purchase the annuity as the same money she inherited, which is not clear, in most cases, mere testimony that property was purchased with separate funds, without any tracing of the funds, is insufficient to rebut the community presumption. *See Schmeltz v. Garey*, 49 Tex. 49, 60–61 (Tex. 1878); *Boyd*, 131 S.W.3d at 614; *Zagorski*, 116 S.W.3d at 316; *Ganesan v. Vallabhaneni*, 96 S.W.3d 345, 354 (Tex.App.-Austin 2002, pet. denied); *Osorno v. Osorno*, 76 S.W.3d 509, 512 (Tex.App.-Houston [14th Dist.] 2002, no pet.); *Bahr v. Kohr*, 980 S.W.2d 723, 728–29 (Tex.App.-San Antonio 1998, no pet.); *Robles*, 965 S.W.2d at 616; *McElwee*, 911 S.W.2d at 189; *see also Mendoza v. Fid. & Guar. Ins. Underwriters, Inc.*, 606 S.W.2d 692, 694 (Tex.1980) (stating that testimonial declarations which are contrary to a party's position are merely some evidence and generally are not conclusive upon the admitter).

■■■ Here, we cannot hold that the trial court's approval of Loretta's inventory and appraisement, the abandoned pleading, and Ray's testimony collectively constitute legally sufficient evidence to rebut the community presumption as applied to the funds used to purchase the Prudential annuity. Well-established case law requires that the party seeking to rebut the community presumption must trace the assets on hand during the marriage back to property that, because of its time and manner of acquisition, is separate in character. *Cockerham*, 527 S.W.2d at 167; *Boyd*, 131 S.W.3d at 612. Thus, taking into consideration the approved inventory and appraisement, Ray's abandoned pleading, and his testimony, we must review the evidence to determine whether Loretta corroborated these assertions by tracing the funds used to purchase the Prudential annuity to Noma's separate property.

As we detailed above, Loretta's tracing expert, Thomas Barber, testified about AmWest Savings account number 11–136970–0 and used bank records to show how the $75,000 in the AmWest account eventually was used to purchase the Prudential annuity.[4] On cross-examination, however, Barber conceded that he did not know the source of the $75,000 used to open AmWest Savings account number 11–136970–0 in October 1993. Moreover, Barber agreed that he was not able to testify as to "what the nature of that property might be." Thus, while Loretta's own tracing expert followed the documentary evidence pertaining to AmWest Savings

---

4. Barber also traced AmWest Savings account number 11–136605–2, which was opened on December 13, 1991 with a $70,000 deposit. Barber testified that on December 21, 1992, Ray withdrew $70,172.37 from AmWest account number 11–136605–2 and purchased an annuity from Ford Life Insurance Company, which later became Sun America Life Insurance Company. Barber testified that on December 29, 1997, Ray received a check totaling $70,007.53 from Sun America payable to Ray and Noma. On January 14, 1998, Ray endorsed the $70,007.53 Sun America check and deposited it plus an additional $5,000 into account number 189495215 at First American Bank. That account was styled "W. Ray Irvin P.O.D. Noma G. Irvin or Loretta Parker." Roughly one month after Noma died in May 1998, Ray changed the First American Bank account to "W. Ray Irvin P.O.D. David Paul Irvin," who is Ray's son. Barber testified that in July 1998 Ray withdrew $55,000 and $5,000 from another account to purchase a house. Ray later withdrew the balance of First American Bank account number 189495215 and purchased a CD at DFW Musicians Credit Union. Barber conceded that he did not know the source of the funds deposited in AmWest account number 11–136605–2.

account number 11–136970–0 *after* it was created in October 1993, he did not offer any evidence tracing the initial $75,000 back to Noma's separate property.

In her brief, Loretta asks the rhetorical question, "[W]here did the money come from to buy the significant assets of Ray and Noma Irvin, including the Prudential annuity?" Loretta argues that because Noma never worked outside the house during her marriage to Ray, she brought into her marriage with Ray only the funds she inherited when her first husband died. Loretta also argues that the evidence at trial demonstrated that Ray "never earned any money so to speak of during their marriage[,] [a]nd he did not have any assets of any significance." Loretta concludes that the "only reasonable inference" the jury could draw concerning the $75,000 at issue is that the money came from Noma's separate property. We reject this contention.

Loretta testified that, over the course of the couple's thirty-year marriage, Noma never worked outside the house but that Ray was involved in the real estate business. Through the testimony of Noma's and the Garland Bishop Estate's CPA, Jerry Mathis, Loretta established that when Garland Bishop died, his and Noma's combined community property estate was valued at around $256,000. Mathis testified that, among other assets, the Garland Bishop Estate continued to operate a partnership business through 1988. Mathis, relying on income tax returns, testified to various distributions from the Garland Bishop Estate made to Noma during her marriage to Ray. Mathis, however, testified that portions of the distributions were principal, and other portions constituted income. For example, in 1986, Noma re-

ceived a $98,180.77 distribution. Mathis testified that $11,098.56 was income and the remaining $87,082.21 was principal. Mathis produced and testified on only seven income tax returns that the Garland Bishop Estate filed during the twenty-three years it operated its partnership business. For the other sixteen years, Mathis made assumptions as to how much money was distributed.

Loretta testified that the only assets Ray brought into the marriage were an old Pontiac and an office building on Tenth Street. While Ray stated in his deposition that until he retired around 1990, he was involved in "[s]ome little real estate activity" that was "not much of anything," at trial Ray testified more specifically about the sources of his income during his marriage to Noma. Ray testified that Noma did not receive social security, but he earned around $580 a month in social security. Ray also testified that he had a promissory note on a piece of property at 1910 Collins that generated roughly $350 a month. Additionally, Ray said he earned $300 a month from property at 2417 Tenth Street. While married to Noma, Ray sold his mother's house on Cedar and personal belongings for $18,000.[5] Aside from the purchase price of Ray's mother's house, Loretta did not dispute any of Ray's testimony concerning his sources of income during his marriage to Noma. *See J.F.C.*, 96 S.W.3d at 266 (stating that, under a legal sufficiency review, we must consider undisputed evidence even if it does not support the challenged finding).

Loretta produced no evidence suggesting that Ray and Noma segregated Noma's separate property from the rest of the couple's money, and the evidence pro-

---

**5.** Ray testified that he sold it for $75,000, but under the applicable standard of review, we look to the evidence of the buyer's testimony

and the deed showing a purchase price of $18,000. *See J.F.C.*, 96 S.W.3d at 266.

duced demonstrates a complete lack of separate treatment of the couple's property. Loretta produced no bank records or documentary evidence showing when all of Loretta's separate funds came into the marriage, how they were segregated from the community estate, and whether separate funds were transferred from accounts containing both Noma's separate property and Ray and Noma's community property. *See Bahr*, 980 S.W.2d at 729; *Anderson v. Gilliland*, 677 S.W.2d 105, 107 (Tex.App.-Dallas 1984), *rev'd on other grounds*, 684 S.W.2d 673 (Tex.1985) (affirming court of appeals's holding that separate funds were not properly traced). Further, Loretta produced no evidence to corroborate Ray's testimony as to what type of property was used to purchase the Prudential annuity. *See Schmeltz*, 49 Tex. at 60–61; *Boyd*, 131 S.W.3d at 616; *Zagorski*, 116 S.W.3d at 316; *Ganesan*, 96 S.W.3d at 354; *Osorno*, 76 S.W.3d at 512; *Bahr*, 980 S.W.2d at 728–29; *Robles*, 965 S.W.2d at 616; *McElwee*, 911 S.W.2d at 189. "When tracing separate property, it is not enough to show that separate funds *could* have been the source of a subsequent deposit of funds. Such conjecture does not constitute sufficient evidence to sustain appellant's burden of tracing to overcome the community property presumption." *Latham*, 560 S.W.2d at 485 (emphasis supplied); *see McKinley v. McKinley*, 496 S.W.2d 540, 543–44 (Tex.1973). In short, based on the evidence before it, the jury was left to rely on surmise and speculation to reach the finding that the funds used to purchase the Prudential annuity came from Noma's separate property—a leap that is impermissible under the law. *See McKinley*, 496 S.W.2d at 543–44; *Latham*, 560 S.W.2d at 485.

Loretta may have produced some evidence at trial that Noma's separate property funds were used to purchase the Prudential annuity, but this is not enough to constitute clear and convincing evidence. *See J.F.C.*, 96 S.W.3d at 264–65 ("Requiring only '[a]nything more than' a mere scintilla of evidence does not equate to clear and convincing evidence."). We have carefully reviewed the record, and under the applicable standard of review, giving due deference to the jury's determinations, we conclude that the evidence is legally insufficient to establish that the Prudential annuity was purchased with Noma's separate property funds. *See id.* at 265–66; *Boyd*, 131 S.W.3d at 611–12. Accordingly, we sustain Ray's first issue.[6]

## IV. CONCLUSION

Having sustained Ray's first issue, we reverse the trial court's judgment insofar as it orders Prudential to turn over the proceeds of the annuity to Noma's estate. Because Loretta failed to prove by legally sufficient evidence that the Prudential annuity was purchased with funds from Noma's separate property, the community presumption governs the characterization of the Prudential annuity. *See* TEX. FAM. CODE ANN. § 3.003(a); *Boyd*, 131 S.W.3d at 612; *Evans*, 14 S.W.3d at 346. We remand the case for a distribution of the Prudential annuity and its proceeds in accordance with the terms of Noma's will concerning her one-half community interest. We affirm the judgment in all other respects.

---

**6.** In light of our disposition of Ray's first issue, we do not address his second or third issues. *See* TEX.R.APP. P. 47.1 (stating opinion need only address every issue necessary to final disposition of the appeal).