

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-07-044-CV

MICHAEL A. REMLEY                                                    APPELLANT

V.

CARLA K. REMLEY                                                        APPELLEE

------------

FROM THE 211TH DISTRICT COURT OF DENTON COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. Introduction

In five points, Appellant Michael A. Remley argues that the trial court erred in its division of the community property and its award of attorney's fees and child support to Appellee Carla K. Remley in their divorce case. We affirm in part and reverse and remand in part.

---

[1] *See* Tex. R. App. P. 47.4.

## II. Factual & Procedural History

Michael filed for a divorce on April 3, 2003. Carla filed a counterpetition. The divorce proceedings were not amicable. Michael represented himself at the final hearing on September 27, 2006. The trial court signed the final decree of divorce and parenting plan on February 2, 2007, and made findings of fact and conclusions of law on June 6, 2007.

Michael challenges the following findings and conclusions:

*Findings of Fact–Divorce*
1. Michael Anthony Remley, Petitioner, and Carla Kay Remley, Respondent, were married in December of 1996.

*Findings of Fact–Child Support*
8. The amount of child support and medical support ordered by the Court is in accordance with the percentage guidelines.

*Findings of Fact–Marital Estate and Community Debt*
11. Michael Anthony Remley and Carla Kay Remley owned a family home/marital residence located in Denton County.

13. Michael Anthony Remley, although ordered by the court to withdraw funds from his 401K retirement plan to pay any arrearage[] on the family home, failed to do so and instead appropriated in excess of $28,000.00 to his personal use and benefit.

*Conclusions of Law–Child Support*
7. Michael Anthony Remley should pay child support to Carla Kay Remley in the amount of $830.60 per month and medical support of $100.00 per month.

*Conclusions of Law–Division of Marital Estate*
8. All the property owned by the parties at the time of the divorce is presumed to be community assets.

10. The division of property as set forth in the decree is fair and equitable with due regard to the rights of each party and balances the waste to the community estate by Michael Anthony Remley and the diversion of those assets to his sole benefit with the remaining assets awarded as provided to Carla Kay Remley.

This appeal followed.

### III. Property Division

In his first point, Michael argues that, with regard to the proceeds from the sale of the family home, the trial court erred by awarding his separate property to Carla because there was no legally sufficient evidence of a common law marriage. He claims that the house was his separate property, purchased before marriage. He also claims that, in the alternative, he paid $26,000 of his separate property funds into the purchase of the house, such that his separate estate had joint ownership of the residence with the community estate. In his fifth point, he complains, again in the alternative, that the trial court abused its discretion in the division of the community property by finding that he appropriated in excess of $28,000 from his 401(k) for his personal use and benefit and then by awarding 100% of the community estate to Carla.

## A. Standard of Review

A trial court has broad discretion in making its "just and right" division of the marital estate. Tex. Fam. Code Ann. § 7.001 (Vernon 2006); *Murff v. Murff*, 615 S.W.2d 696, 698–99 (Tex. 1981). Absent a clear abuse of discretion, we will not disturb that division. *Bell v. Bell*, 513 S.W.2d 20, 22 (Tex. 1974); *Boyd v. Boyd*, 67 S.W.3d 398, 406 (Tex. App.—Fort Worth 2002, no pet.).

An abuse of discretion does not occur where the trial court bases its decisions on conflicting evidence. *In re Barber*, 982 S.W.2d 364, 366 (Tex. 1998). Furthermore, an abuse of discretion does not occur as long as some evidence of substantive and probative character exists to support the trial court's decision. *See Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002).

In this case, the trial court filed its findings of fact and conclusions of law after the judgment. Findings of fact entered in a case tried to the court have the same force and dignity as a jury's answers to jury questions. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). The trial court's findings of fact are reviewable for legal sufficiency of the evidence to support them by the same standards that are applied in reviewing evidence supporting a jury's answer. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *Catalina*

4

*v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994).  However, our role in reviewing cases where property is divided in a divorce action is to determine only if there is an abuse of discretion in the property division, and if there is, to remand the case to the trial court.  *See McKnight v. McKnight*, 543 S.W.2d 863, 866 (Tex. 1976); *see also* Tex. Fam. Code Ann. § 7.001.

Property possessed by either spouse at the dissolution of the marriage is presumed to be community property, and a party who seeks to assert the separate character of property must prove that character by clear and convincing evidence.  Tex. Fam. Code Ann. § 3.003 (Vernon 2006).  Clear and convincing evidence is that measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.  *See id*. § 101.007 (Vernon 2002); *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 31 (Tex. 1994).  This intermediate standard falls between the preponderance standard of civil proceedings and the reasonable doubt standard of criminal proceedings.  *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979). While the proof must weigh heavier than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed.  *Addington*, 588 S.W.2d at 570.

We review the trial court's conclusions of law de novo as legal questions. *See In re Marriage of Royal*, 107 S.W.3d 846, 850 (Tex. App.—Amarillo 2003, no pet.). A conclusion of law will not be reversed unless it is erroneous as a matter of law. *Id*.

**B. Common Law Marriage & Community Property**

A "common law" marriage may be established by evidence that the man and woman agreed to be married and after the agreement they lived together in Texas as husband and wife and represented to others that they were married. Tex. Fam. Code Ann. § 2.401(a)(2) (Vernon 2006). The existence of such a marriage is a fact question with the burden of proof, by a preponderance of the evidence, on the person seeking to establish the existence of the marriage. *Jenkins v. Jenkins*, 16 S.W.3d 473, 480 (Tex. App.—El Paso 2000, no pet.). The status of the property as community or separate is to be determined by the origin of the title to the property. *Jensen v. Jensen*, 665 S.W.2d 107, 109 (Tex. 1984).

Here, if the parties were married when they purchased the house, then the house was community property. *See id.*; *see also* Tex. Fam. Code Ann. §§ 3.002–.003. If the parties were not married when they purchased the house, but both parties contributed funds, then they each had a separate property interest in the house and had the burden to trace the amount of their

6

separate property interests by clear and convincing evidence. *See* Tex. Fam. Code Ann. §§ 3.001(1) ("A spouse's separate property consists of the property owned or claimed by the spouse before marriage."); 3.003(a) ("Property possessed by either spouse during or on dissolution of marriage is presumed to be community property."); *Estate of Hanau v. Hanau*, 730 S.W.2d 663, 667 (Tex. 1987) (stating that, to overcome the community presumption, the burden is on the spouse claiming certain property as separate to trace and clearly identify the property claimed to be separate). Tracing involves establishing the separate origin of the property through evidence showing the time and means by which the spouse originally obtained possession of the property. *Boyd*, 131 S.W.3d at 612. As a general rule, however, mere testimony that property was purchased with separate funds, without any tracing of the funds, is insufficient to rebut the community presumption. *Irvin v. Parker*, 139 S.W.3d 703, 708 (Tex. App.—Fort Worth 2004, no pet.). We resolve any doubt as to the character of property in favor of the community estate. *Id*.

**1. December 1996 Marriage Finding & Community Property Conclusion**

The trial court found that the couple was married in December 1996, and it concluded that "[a]ll the property owned by the parties at the time of the divorce is presumed to be community assets." Carla gave the following testimony:

7

Q. When were we married?

A. December of 1996.

Q. And when—did we—when we purchased the house on Evers, were we married then?

A. We—

Q. When we purchased the house?

A. We were. We presented ourself—

Q. And was your name on the title? Did you help with the buying of the house?

A. What do you mean by did I help?

Q. Did you put any—

A. We bought the house together.

Q. Did you put money into the house?

A. Yes, I did.

Q. You did? What—what amount of money did you put into the house?

A. Well, I believe I came into our relationship with $15,000.

Q. But you—did you not spend the $15,000 prior to purchasing your house? Did—did—did you give me the $15,000?

A. I believe that we shared it together.

Q. Do you remember how much we put down on the house together?

8

A.    $20,000.

Q.    Your name isn't on this anywhere, though, is it?

A.    No.  It was never put on my name.  It sure wasn't.

      . . . .

Q.    Did we not get married in March?

A.    We had a wedding ceremony in March.

Q.    So not December?

A.    As far as I'm concerned, we were already married.  We were—it was just a technicality as far as changing the last name.

Michael did not testify with regard to when the parties were married and failed to controvert Carla's testimony.

The trial court took judicial notice of the entire contents of the court's file in the case.  The parties' pleadings reveal that both parties originally pleaded that the marriage occurred on March 21, 1999, and that Carla subsequently amended her counter-petition to allege that the parties were married "on or about December 1, 1999."

On this record, Carla failed to establish all three elements of a common law marriage—specifically that, on or about December 1, 1996 and thereafter until the ceremonial marriage on March 21, 1999, she and Michael agreed to be married, that they lived together as husband and wife, and that they

9

represented to others that they were married.[2]  *See* Tex. Fam. Code Ann. § 2.401(a)(2).  Therefore, the trial court abused its discretion by finding that the parties were married in December 1996.

However, because property possessed by either spouse at the dissolution of the marriage is presumed to be community property, and because neither the testimony at trial nor anything else in the record reflects when the house was purchased, other than Carla's testimony that it was purchased when they were married, the trial court did not abuse its discretion by concluding that the house was presumed community property.

Furthermore, with regard to the house, the trial court asked Michael, "Anything else you want me to know about before I make a decision?"  Michael replied, "I put $26,000 down on the house myself," and claimed that he got that $26,000 "[f]rom the sale of the house on Congress that I owned prior."  Michael did not elaborate about whether he meant "prior" to mean before marriage or before the purchase of the marital residence.

Carla's testimony that they put $20,000 down on the house together and that at least $15,000 was hers controverted Michael's testimony as to the amount of alleged separate property that he invested in the purchase.  Because

---

[2] Carla apparently started to testify to this, stating "We presented ourself—," but she was cut off by Michael.

the party seeking to assert the separate character of property must prove that character by clear and convincing evidence, the trial court could have reasonably concluded that because Michael did not produce sufficient evidence of having actually owned and sold a previous house that was his separate property, and because Carla's testimony controverted the characterization and the dollar amounts invested in the marital residence, that Michael did not sufficiently trace the alleged separate property funds to rebut the community property presumption. Tex. Fam. Code Ann. § 3.003; *Irvin*, 139 S.W.3d at 708. Therefore, we overrule Michael's first point.

**2. 401(k) Finding & Community Property Award**

In his fifth point, Michael argues that the trial court abused its discretion in the division of community property. Michael's complaint centers on the award of 100% of the community estate to Carla, stating that a "major reason for the disproportionate division had to be the court's finding that Appellant appropriated in excess of $28,000.00 from his 401(k) for his personal use and benefit."

The trial court found that Michael failed to withdraw funds from his 401(k) retirement plan to pay any arrearage on the family home, although ordered by the trial court to do so, and instead appropriated in excess of $28,000.00 to his personal use and benefit. It concluded that the property

11

division set forth in its decree was fair and equitable "with due regard to the rights of each party and balance[d] the waste to the community estate by Michael Anthony Remley and the diversion of those assets to his sole benefit with the remaining assets awarded as provided to Carla Kay Remley."

Community property includes retirement benefits earned during marriage. *See McClary v. Thompson*, 65 S.W.3d 829, 834, 836 (Tex. App.—Fort Worth 2002, pet. denied). In making its "just and right" division of the community property, the trial court may consider such factors as the spouses' capacities and abilities, including earning capacity; business opportunities; education; relative physical conditions; relative financial condition and obligations; disparity of ages; size of separate estates; and the nature of the community property. *Murff*, 615 S.W.2d at 699.

Carla testified that it was Michael's plan to leave her destitute. He quit paying bills— "[her] car insurance, electric, phone, cable, house payment"—and allowed their house to go into foreclosure and the utilities to be cut off, "drained" the joint bank accounts, and forced her and their ten-year-old child, C.A.R., to become dependent upon her parents.[3] She testified that Michael

---

[3] ⬚ Carla's exact testimony was:

His plan was to leave me with nothing. He felt that I deserved nothing, and he was going to make sure I had nothing. . . . He's

12

was spending $350 a week playing the lottery while deliberately dodging employment and failing to pay child support for five months. She also testified that the sales proceeds of the home were reduced by $1,551 by a lien from a water extraction company that had not been paid because the insurance company sent the check directly to Michael, who deposited it and did not use it to pay the company's bill. She testified that she had been a housewife since December 2002, when she was laid off from her job at a produce company, and that she had a high school education.

Carla gave the following testimony at trial about the 401(k):

Q. Did any assets disappear during that time when y'all were trying to reconcile?

A. Yes.

Q. What disappeared?

A. He closed out all of his 401k.

Q. How much money was—was in there?

---

made life hell. I mean, he quit paying all of our bills. We—my son [C.A.R.] and I[—] had to move out of our house. It was 20 degrees outside. We had no electric. We have had no phone. . . . No groceries. He drained all the accounts. He did away with everything. . . . Did nothing to get our house out of foreclosure. In a total of three and a half months, [C.A.R.] and I received $170 cash.

13

A.    To my knowledge, at least $28,000.

Q.    And did you get any of that money?

A.    No.  It was—

Q.    How did you find out that the account had been drained?

A.    He let me know that he was expecting a Fed Ex check and let him know when Fed Ex came.  He happened to be home when Fed Ex came, and he got it directly and left with it.  I never saw it.

Q.    So you don't know how much it was?

A.    No, ma'am.

Q.    Did he tell you it was a withdrawal from his 401k?

A.    No.

Q.    How did you find—

A.    Yes.  I'm sorry.  Yes, he did.

With regard to the 401(k), Michael testified, "I took it out like y'all asked me to and gave it to Carla," but he also testified:

The—the retirement money was taken out to pay bills on the credit cards.  I mean—and I—and I did have refinancing okayed.  And—and it required Carla's signature, and she wouldn't sign it.  That's why we got in the shape and ending up getting where we were.  I mean, I—I will take responsibility.  I got us there.  But we—I had worked—I had worked a way out of it, but I—but I—without her signature, it wouldn't happen.

14

Michael admitted that he had not given the mortgage company any money, paid child support since May 2006 ($4,153), paid the attorney's fees he had been ordered by the court to pay Carla's previous attorney ($1,500), or paid her current attorney's fees pertaining to a discovery dispute ($1,000).

The record reflects that the purpose of the final hearing was primarily to determine custody of the child and child support. At the beginning of the proceeding, Carla's attorney stated, "[I]t's my understanding . . . that we have an agreement with regards to the community estate[,] which at this point is very nominal—there is not much left." Michael replied, "We're not in agreement if that—if she doesn't say yes to that . . . . I'm not going to give her all of that if she doesn't agree to no child support." During Carla's testimony, she requested that Michael be required to pay the $830 per month child support that he had apparently been ordered to pay before the final hearing.[4] She also testified that the proceeds from the sale of the house, $34,851.47, and her car, a 1997 Pontiac Transport minivan, were the only community assets left at that point.

The following exchange occurred during Michael's testimony:

---

[4] We note "apparently" because the record is incomplete—there were no transcripts of any other hearings included in the record.

15

Q. Is there any item of property that we have not talked about here that needs to be divided, personal property or real estate?

A. I didn't get—I didn't get anything out of the house, so I don't know what all—she loaded up everything. I was unable to get back in the house.

. . . .

Q. [Are] there any items that we have not divided or something that you want or something that hasn't been discussed, something of value that we need to address here with the Court today?

A. No. She can have it all.

Q. And your only objection to her having the money that's in the registry of the court is that you don't want to pay child support? Is that correct?

A. Yes or no? That's correct.

Q. That is correct?

A. That's correct.

In his closing argument, Michael again asserted, "[L]ike I said, I am willing to let her have the—the funds from the house if there is no child support payments."

Notwithstanding any waiver by Michael of objections to the trial court's division of the community property during the final hearing, the trial court was entitled to believe Carla and to disbelieve Michael with regard to the existence

16

and expenditure of any 401(k) benefits.  Furthermore, the remaining testimony at the final hearing provided it with ample justification to award the remaining assets—Carla's car and the proceeds from the sale of the family home, to Carla.[5]  We overrule Michael's fifth point.

## IV.  Child Support

In his second point, Michael complains that the trial court erred by ordering him to pay $830.60 per month in child support because the evidence does not support a finding that he had the income to be ordered to pay that much per month in child support.  He also contends that there is insufficient evidence to support the necessary finding that he is intentionally unemployed or underemployed.  In his third and fourth points, he complains that the trial court erred by awarding to Carla over $8,000 in attorney's fees, and by finding that these attorney's fees were additional child support.

---

[5] Michael does not challenge the trial court's finding that he "was spending $350.00 on lottery tickets each week while not paying his court ordered child support"; the finding that he ceased to support his family in August 2005, including child support, house payments, car payments, phone and utilities; or the finding that he received a check for $1551.00 for an insurance claim for damage to the family home, endorsed, and cashed the check and utilized the funds for his sole use and benefit, leaving Carla to pay the contractors at the sale of the family home.

17

**A. Standard of Review**

A trial court has discretion to set child support within the parameters established by the child support guidelines set forth in the family code. *Rodriguez v. Rodriguez*, 860 S.W.2d 414, 415 (Tex. 1993); *In re Z.B.P.*, 109 S.W.3d 772, 781 (Tex. App.—Fort Worth 2003, no pet.). A trial court's decision in this regard will not be overturned unless a clear abuse of discretion is shown. *Rodriguez*, 860 S.W.2d at 415. We will not revise the trial court's judgment merely because we consider the amount of the child support award either too high or too low. *In re P.J.H.*, 25 S.W.3d 402, 405 (Tex. App.—Fort Worth 2000, no pet.). And, absent an abuse of discretion, we will not disturb the award of attorney's fees in a divorce case or suit affecting the parent-child relationship. *See* Tex. Fam. Code Ann. § 106.002(a) (Vernon Supp. 2008); *Samara v. Samara*, 52 S.W.3d 455, 458 (Tex. App.—Houston [1st Dist.] 2001, pet. denied).

**B. Monthly Child Support**

The trial court may order either parent to support a child in the manner specified by the order until the child is eighteen years of age or until graduation from high school, whichever occurs later. Tex. Fam. Code Ann. § 154.001(a)(1) (Vernon Supp. 2008). The child support guidelines set out the method of calculation based on information a party is required to furnish with

18

regard to his net resources and ability to pay child support, including copies of income tax returns for the prior two years, a financial statement, and current pay stubs. *See id.* §§ 154.061–.063 (Vernon 2002). In the absence of such evidence, the court shall presume that the party has wages or salary equal to the federal minimum wage for a forty-hour week. *Id.* § 154.068. Under the guidelines, support for one child should be 20% of the party's net resources. *Id.* § 154.125.

If the party's actual income is significantly less than what he could earn because of intentional unemployment or underemployment, the trial court may apply the support guidelines to the party's earning potential. *Id.* § 154.066. But for a trial court to find that a parent is intentionally underemployed or unemployed, there must be evidence that the parent reduced his income for the purpose of decreasing his child support payments. *P.J.H.*, 25 S.W.3d at 405–06. There is no presumption that simply because a parent is no longer as lucratively employed as he was during his marriage, he is intentionally underemployed or unemployed. *Id.* The requisite intent or lack thereof, however, may be inferred from such circumstances as the parent's business reversals, business background, and earning potential. *Id.*

There was limited testimony at the final hearing on the issue of Michael's employment. Carla testified that she believed her husband was intentionally

underemployed because "with his experience and his training and his qualifications, he could have had another job if he had wanted to." She further testified that he had testified at a previous hearing that he was spending $350 weekly on "scratch-off[]" lottery tickets. Michael testified that he was unemployed and that he was capable of making $650 a week at the time of trial, but that nobody had offered him anything. He testified that he was receiving unemployment, that there was nothing available employment-wise for him at the salary that he had received at the time he was laid off from his job of twenty-five years, and that he probably could make $650 a week as an estimator, approximately $2,816 per month.

Michael's highest income year prior to his termination was 2003, when he earned $87,580; he made $77,200 in 2004. According to Michael's affidavit of net worth, filed January 5, 2007, he was unemployed, living with his parents, and had no income as his unemployment compensation had ended. The trial court set base child support at $830.60 a month plus $100 a month toward insurance. This figure would have necessarily been based on assumed gross earnings of about $4,150 a month or about $49,800 per year. *See* Tex. Fam. Code Ann. § 154.125.

We have not been favored with the transcript of the prior hearing, and there is no evidence in the record with regard to how the trial court reached the

20

$830.60 figure.[6] Based on the evidence that is before us, however, it can be distilled to three basic facts: (1) Michael previously earned in the $77,000–$86,000 range; (2) Carla felt he could be employed if he wanted to be; and (3) Michael testified that he could make about $33,800 a year as an estimator, his previous job. Based on the foregoing, and in the absence of any evidence to support the calculation of the trial court's $830.60 figure, and the absence of any evidence that Michael reduced his income for the purpose of decreasing his child support payments, we hold that the trial court erred in setting child support at $830.60 a month. We sustain Michael's second point.

## C. Attorney's Fees & Child Support Enforcement

Michael complains both about the award of additional attorney's fees and the lack of evidence to support them. However, although he complains that Carla's attorney did not testify about how many hours she worked or what amount of the fees were attributable to the child support issue, there is no rigid requirement that the number of hours or the hourly rate must be introduced into

---

[6] The trial court asked Carla's attorney during closing arguments about how she came up with the $830.60 that she requested for child support. She replied, "The [$]830 I had come up with, Your Honor, was what the Court had found at the last hearing." Although we must presume that a partial reporter's record designated by the parties constitutes the entire record, the record here reflects that there was *nothing* before the trial court to support its conclusion. *See* Tex. R. App. P. 34.6(c)(4).

21

evidence to support a finding that attorney's fees are necessary and reasonable. *Brockie v. Webb*, 244 S.W.3d 905, 909 (Tex. App.—Dallas 2008, pet. denied); *Hagedorn v. Tisdale*, 73 S.W.3d 341, 354 (Tex. App.—Amarillo 2002, no pet.).

Furthermore, Carla's attorney did testify that she charged $200 per hour, that her paralegal charged $100 per hour, and that, not including the time spent at the hearing, Carla had incurred $8,203.50 in legal fees in the case.[7] The principal issues in the case were the payment of child support and the disbursement of proceeds from the sale of the house. Carla's attorney testified that the fee was reasonable based on the time and labor required, the preclusion of other employment, the fee customarily charged in Denton County for similar legal services, the time limitation imposed by the parties or the circumstances, and the nature and length of her professional relationship with Carla.[8] Based on this information, the trial court could have concluded that Carla's attorney's fees were reasonable.

Additionally, in a hearing with regard to the payment of child support,

---

[7] Based on the amount the attorney testified that she and her paralegal charged, this total would amount to either forty-one hours of attorney-time, eighty-two hours of paralegal-time, or some combination thereof.

[8] Michael made no objections during Carla's attorney's testimony and opted not to perform any cross-examination during the hearing on the attorney's fees issue.

22

> If the court finds that the respondent has failed to make child support payments, the court shall order the respondent to pay the movant's reasonable attorney's fees and all court costs in addition to the arrearages. Fees and costs ordered under this subsection may be enforced by any means available for the enforcement of child support, including contempt.

Tex. Fam. Code Ann. § 157.167(a) (Vernon Supp. 2008). Therefore, if the trial court could have reasonably concluded that the hearing's primary purpose was to enforce Michael's obligation to pay child support and it found that Michael had failed to make child support payments, then it had no discretion but to order Michael to pay Carla's reasonable attorney's fees unless it also found that there was good cause for his failure to pay. *See id.* § 157.167(a) & (c).

At the conclusion of the hearing, the trial court stated,

> I am also going to award $8,200 in additional attorney's fees. And I am going to make—I find that those are directly related to the establishment and—and collection of child support and make that an additional child support obligation, because I think that's what the hearing was about today is him not wanting to pay child support. So that extra $8,200 is directly related to the child support, and I so find and order that [it] be paid at another $100 a month as additional child support until that $8,200 is discharged.

Although Michael contends that the evidence did not support the trial court's award or its finding that the fees should be awarded in the nature of additional child support, the record reflects that the heart of the case involved the question of child support. As previously addressed above, Carla's attorney informed the trial court that the hearing's purpose was "with regards to custody

23

of the child and child support," to which Michael replied, "I'm not going to give her all of that if she doesn't agree to no child support."

In addition to her other testimony, Carla testified that Michael stopped paying child support when he lost his job and, by the time of the hearing, had not paid any for five months. Carla replied, "yes," when her attorney asked, "So are you requesting that your husband be required to pay the $830 a month in child support like he was ordered before?" Child support and insurance for their child were among the other items Carla requested, which were a divorce, award of her vehicle, the $34,851.47 in the court's registry, and approval of the final parenting plan. Michael did not deny failing to pay child support and just claimed that he did not have enough money. As previously addressed, Michael testified that his only objection to Carla having the $34,851.47 is that he did not want to pay child support, and in his closing argument, he again indicated that he was willing to let Carla have the $34,851.47 as long as he did not have to pay child support.[9] Under these circumstances, we cannot say that the trial court's actions in awarding $8,200 in attorney's fees to Carla or in finding that they were additional child support were so arbitrary or unreasonable

---

[9] During Michael's closing argument, the trial court asked, "So you think I ought to award her all the property and . . . just set child support at zero?" Michael replied, "Yes, sir . . . that's fine with me."

24

as to amount to an abuse of discretion.  Therefore, we overrule the remainder of Michael's third and fourth points.

## V. Conclusion

Having sustained Michael's second point, we reverse and remand this point to the trial court to recalculate the amount of child support Michael is required to pay.  Because we overrule the remainder of Michael's points, we affirm the rest of the trial court's judgment.

PER CURIAM

PANEL:  MCCOY, J.; CAYCE, C.J.; and HOLMAN, J.

DELIVERED: September 25, 2008