COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                 FORT
WORTH

 

 

                                        NO.
2-07-044-CV

 

 

MICHAEL A. REMLEY                                                           APPELLANT

 

                                                   V.

 

CARLA K. REMLEY                                                                 APPELLEE

 

                                              ------------

 

            FROM
THE 211TH DISTRICT COURT OF DENTON COUNTY

 

                                              ------------

 

                                MEMORANDUM
OPINION[1]

 

                                              ------------

I.  Introduction 

In five points, Appellant
Michael A. Remley argues that the trial court erred in its division of the
community property and its award of attorney=s fees and child support to Appellee Carla K. Remley in their divorce
case.  We affirm in part and reverse and
remand in part.








II.  Factual & Procedural History

Michael filed for a divorce
on April 3, 2003.  Carla filed a counterpetition.  The divorce proceedings were not
amicable.  Michael represented himself at
the final hearing on September 27, 2006. 
The trial court signed the final decree of divorce and parenting plan on
February 2, 2007, and made findings of fact and conclusions of law on June 6,
2007.

Michael challenges the
following findings and conclusions:

Findings
of FactBDivorce


1.
Michael Anthony Remley, Petitioner, and Carla Kay Remley, Respondent, were
married in December of 1996.

 

Findings
of FactBChild
Support

8.
The amount of child support and medical support ordered by the Court is in
accordance with the percentage guidelines.

 

Findings
of FactBMarital
Estate and Community Debt

11.
Michael Anthony Remley and Carla Kay Remley owned a family home/marital
residence located in Denton County.

 

13.
Michael Anthony Remley, although ordered by the court to withdraw funds from
his 401K retirement plan to pay any arrearage[] on the family home, failed to
do so and instead appropriated in excess of $28,000.00 to his personal use and
benefit.

 

Conclusions
of LawBChild
Support

7.
Michael Anthony Remley should pay child support to Carla Kay Remley in the
amount of $830.60 per month and medical support of $100.00 per month.

 

 

 








Conclusions
of LawBDivision
of Marital Estate

8.
All the property owned by the parties at the time of the divorce is presumed to
be community assets. 

 

10.
The division of property as set forth in the decree is fair and equitable with
due regard to the rights of each party and balances the waste to the community
estate by Michael Anthony Remley and the diversion of those assets to his sole
benefit with the remaining assets awarded as provided to Carla Kay Remley.

 

This appeal followed.

III. Property Division

In his first point, Michael
argues that, with regard to the proceeds from the sale of the family home, the
trial court erred by awarding his separate property to Carla because there was
no legally sufficient evidence of a common law marriage.  He claims that the house was his separate
property, purchased before marriage.  He
also claims that, in the alternative, he paid $26,000 of his separate property
funds into the purchase of the house, such that his separate estate had joint
ownership of the residence with the community estate.  In his fifth point, he complains, again in
the alternative, that the trial court abused its discretion in the division of
the community property by finding that he appropriated in excess of $28,000
from his 401(k) for his personal use and benefit and then by awarding 100% of
the community estate to Carla.

 

 








A. Standard of Review

A trial court has broad
discretion in making its Ajust and
right@ division of the marital estate. 
Tex. Fam. Code Ann. ' 7.001 (Vernon 2006); Murff v. Murff, 615 S.W.2d 696, 698_99
(Tex. 1981).  Absent a clear abuse of
discretion, we will not disturb that division. 
Bell v. Bell, 513 S.W.2d 20, 22 (Tex. 1974); Boyd v. Boyd,
67 S.W.3d 398, 406 (Tex. App.CFort Worth 2002, no pet.).     

An abuse of discretion does
not occur where the trial court bases its decisions on conflicting
evidence.  In re Barber, 982
S.W.2d 364, 366 (Tex. 1998). 
Furthermore, an abuse of discretion does not occur as long as some
evidence of substantive and probative character exists to support the trial
court=s decision.  See Butnaru v.
Ford Motor Co., 84 S.W.3d 198, 211 (Tex. 2002).








In this case, the trial court
filed its findings of fact and conclusions of law after the judgment.  Findings of fact entered in a case tried to
the court have the same force and dignity as a jury=s answers to jury questions.  Anderson
v. City of Seven Points, 806 S.W.2d 791, 794 (Tex. 1991).  The trial court=s findings of fact are reviewable for legal sufficiency of the
evidence to support them by the same standards that are applied in reviewing
evidence supporting a jury=s answer.  Ortiz v. Jones,
917 S.W.2d 770, 772 (Tex. 1996); Catalina v. Blasdel, 881 S.W.2d 295,
297 (Tex. 1994).  However, our role in
reviewing cases where property is divided in a divorce action is to determine
only if there is an abuse of discretion in the property division, and if there
is, to remand the case to the trial court. 
See McKnight v. McKnight, 543 S.W.2d 863, 866 (Tex. 1976); see
also Tex. Fam. Code Ann. ' 7.001.   

Property possessed by either
spouse at the dissolution of the marriage is presumed to be community property,
and a party who seeks to assert the separate character of property must prove
that character by clear and convincing evidence.  Tex. Fam. Code Ann. ' 3.003 (Vernon 2006).  Clear and
convincing evidence is that measure or degree of proof that will produce in the
mind of the trier of fact a firm belief or conviction as to the truth of the
allegations sought to be established.  See
id. ' 101.007 (Vernon 2002); Transp. Ins. Co. v. Moriel, 879 S.W.2d
10, 31 (Tex. 1994).  This intermediate
standard falls between the preponderance standard of civil proceedings and the
reasonable doubt standard of criminal proceedings.  In re G.M., 596 S.W.2d 846, 847 (Tex.
1980); State v. Addington, 588 S.W.2d 569, 570 (Tex. 1979).  While the proof must weigh heavier than
merely the greater weight of the credible evidence, there is no requirement
that the evidence be unequivocal or undisputed. 
Addington, 588 S.W.2d at 570. 








We review the trial court=s conclusions of law de novo as legal questions.  See In re Marriage of Royal, 107 S.W.3d
846, 850 (Tex. App.CAmarillo
2003, no pet.).  A conclusion of law will
not be reversed unless it is erroneous as a matter of law.  Id.    

B. Common Law Marriage & Community Property

A Acommon law@ marriage
may be established by evidence that the man and woman agreed to be married and
after the agreement they lived together in Texas as husband and wife and
represented to others that they were married. 
Tex. Fam. Code Ann. ' 2.401(a)(2) (Vernon 2006).  The
existence of such a marriage is a fact question with the burden of proof, by a
preponderance of the evidence, on the person seeking to establish the existence
of the marriage.  Jenkins v. Jenkins,
16 S.W.3d 473, 480 (Tex. App.CEl Paso 2000, no pet.).  The
status of the property as community or separate is to be determined by the
origin of the title to the property.  Jensen
v. Jensen, 665 S.W.2d 107, 109 (Tex. 1984). 









Here, if the parties were
married when they purchased the house, then the house was community
property.  See id.; see also Tex.
Fam. Code Ann. '' 3.002_.003.  If the parties were not married when they
purchased the house, but both parties contributed funds, then they each had a
separate property interest in the house and had the burden to trace the amount
of their separate property interests by clear and convincing evidence.  See Tex. Fam. Code Ann. '' 3.001(1) (AA spouse=s separate property consists of the property owned or claimed by the
spouse before marriage.@); 3.003(a)
(AProperty possessed by either spouse during or on dissolution of
marriage is presumed to be community property.@); Estate of Hanau v. Hanau, 730 S.W.2d 663, 667 (Tex. 1987)
(stating that, to overcome the community presumption, the burden is on the
spouse claiming certain property as separate to trace and clearly identify the property
claimed to be separate).  Tracing
involves establishing the separate origin of the property through evidence
showing the time and means by which the spouse originally obtained possession
of the property.  Boyd, 131 S.W.3d
at 612.  As a general rule, however, mere
testimony that property was purchased with separate funds, without any tracing
of the funds, is insufficient to rebut the community presumption.  Irvin v. Parker, 139 S.W.3d 703, 708
(Tex. App.CFort Worth
2004, no pet.).  We resolve any doubt as
to the character of property in favor of the community estate.  Id. 

1. December 1996 Marriage
Finding & Community Property Conclusion 

The trial court found that
the couple was married in December 1996, and it concluded that A[a]ll the property owned by the parties at the time of the divorce is
presumed to be community assets.@  Carla gave the following
testimony:








Q.     When were we married?

 

A.     December of 1996.

 

Q.     And whenCdid
weCwhen
we purchased the house on Evers, were we married then?

 

A.     WeC

 

Q.     When we purchased the house?

 

A.     We were.  We presented
ourselfC

 

Q.     And was your name on the title? 
Did you help with the buying of the house?

 

A.     What do you mean by did I help?

 

Q.     Did you put anyC

 

A.     We bought the house together.

 

Q.     Did you put money into the house?

 

A.     Yes, I did.

 

Q.     You did?  WhatCwhat
amount of money did you put into the house?

 

A.     Well, I believe I came into our relationship with $15,000.

 

Q.     But youCdid
you not spend the $15,000 prior to purchasing your house?  DidCdidCdid
you give me the $15,000?

 

A.     I believe that we shared it together.

 

Q.     Do you remember how much we put down on the house together?

 








A.     $20,000.

 

Q.     Your name isn=t on this anywhere, though,
is it?

 

A.     No.  It was never put on my
name.  It sure wasn=t.

 

. . . .

 

Q.     Did we not get married in March?

 

A.     We had a wedding ceremony in March.

 

Q.     So not December?

 

A.     As far as I=m
concerned, we were already married.  We
wereCit
was just a technicality as far as changing the last name.

 

Michael did not testify with regard to when the
parties were married and failed to controvert Carla=s testimony.

The trial court took judicial
notice of the entire contents of the court=s file in the case.  The parties= pleadings reveal that both parties originally pleaded that the
marriage occurred on March 21, 1999, and that Carla subsequently amended her
counter-petition to allege that the parties were married Aon or about December 1, 1999.@








On this record, Carla failed
to establish all three elements of a common law marriageCspecifically that, on or about December 1, 1996 and thereafter until
the ceremonial marriage on March 21, 1999, she and Michael agreed to be
married, that they lived together as husband and wife, and that they
represented to others that they were married.[2]  See Tex. Fam. Code Ann. ' 2.401(a)(2).  Therefore, the
trial court abused its discretion by finding that the parties were married in
December 1996. 

However, because property
possessed by either spouse at the dissolution of the marriage is presumed to be
community property, and because neither the testimony at trial nor anything
else in the record reflects when the house was purchased, other than Carla=s testimony that it was purchased when they were married, the trial
court did not abuse its discretion by concluding that the house was presumed
community property.

Furthermore, with regard to
the house, the trial court asked Michael, AAnything else you want me to know about before I make a decision?@  Michael replied, AI put $26,000 down on the house myself,@ and claimed that he got that $26,000 A[f]rom the sale of the house on Congress that I owned prior.@ Michael did not elaborate about whether he meant Aprior@ to mean
before marriage or before the purchase of the marital residence.








Carla=s testimony that they put $20,000 down on the house together and that
at least $15,000 was hers controverted Michael=s testimony as to the amount of alleged separate property that he
invested in the purchase.  Because the
party seeking to assert the separate character of property must prove that
character by clear and convincing evidence, the trial court could have
reasonably concluded that because Michael did not produce sufficient evidence
of having actually owned and sold a previous house that was his separate
property, and because Carla=s testimony controverted the characterization and the dollar amounts
invested in the marital residence, that Michael did not sufficiently trace the
alleged separate property funds to rebut the community property
presumption.  Tex. Fam. Code Ann. ' 3.003; Irvin, 139 S.W.3d at 708.  Therefore, we overrule Michael=s first point.

2. 401(k) Finding &
Community Property Award

In his fifth point, Michael
argues that the trial court abused its discretion in the division of community
property.  Michael=s complaint centers on the award of 100% of the community estate to
Carla, stating that a Amajor reason
for the disproportionate division had to be the court=s finding that Appellant appropriated in excess of $28,000.00 from his
401(k) for his personal use and benefit.@








The trial court found that
Michael failed to withdraw funds from his 401(k) retirement plan to pay any
arrearage on the family home, although ordered by the trial court to do so, and
instead appropriated in excess of $28,000.00 to his personal use and benefit.  It concluded that the property division set
forth in its decree was fair and equitable Awith due regard to the rights of each party and balance[d] the waste
to the community estate by Michael Anthony Remley and the diversion of those
assets to his sole benefit with the remaining assets awarded as provided to
Carla Kay Remley.@       

Community property includes
retirement benefits earned during marriage. 
See McClary v. Thompson, 65 S.W.3d 829, 834, 836 (Tex. App.CFort Worth 2002, pet. denied). 
In making its Ajust and
right@ division of the community property, the trial court may consider such
factors as the spouses= capacities
and abilities, including earning capacity; business opportunities; education;
relative physical conditions; relative financial condition and obligations;
disparity of ages; size of separate estates; and the nature of the community
property.  Murff, 615 S.W.2d at
699. 








Carla testified that it was
Michael=s plan to leave her destitute. 
He quit paying billsCA[her] car insurance, electric, phone, cable, house payment@Cand allowed their house to go into foreclosure and the utilities to be
cut off, Adrained@ the joint bank accounts, and forced her and their ten-year-old child,
C.A.R., to become dependent upon her parents.[3]  She testified that Michael was spending $350
a week playing the lottery while deliberately dodging employment and failing to
pay child support for five months.  She
also testified that the sales proceeds of the home were reduced by $1,551 by a
lien from a water extraction company that had not been paid because the
insurance company sent the check directly to Michael, who deposited it and did
not use it to pay the company=s bill.  She testified that she
had been a housewife since December 2002, when she was laid off from her job at
a produce company, and that she had a high school education.

Carla gave the following
testimony at trial about the 401(k):

Q.     Did any assets disappear during that time when y=all
were trying to reconcile?

 

A.     Yes.

 

Q.     What disappeared?

 

A.     He closed out all of his 401k.

 

Q.     How much money wasCwas in there?

 








A.     To my knowledge, at least $28,000.

 

Q.     And did you get any of that money?

 

A.     No.  It wasC

 

Q.     How did you find out that the account had been drained?

 

A.     He let me know that he was expecting a Fed Ex check and let him
know when Fed Ex came.  He happened to be
home when Fed Ex came, and he got it directly and left with it.  I never saw it.

 

Q.     So you don=t
know how much it was?

 

A.     No, ma=am.

 

Q.     Did he tell you it was a withdrawal from his 401k?

 

A.     No.

 

Q.     How did you findC

 

A.     Yes.  I=m sorry.  Yes, he did.

With regard to the 401(k),
Michael testified, AI took it
out like y=all asked me
to and gave it to Carla,@ but he also
testified:

TheCthe
retirement money was taken out to pay bills on the credit cards.  I meanCand ICand I
did have refinancing okayed.  AndCand
it required Carla=s
signature, and she wouldn=t
sign it.  That=s why
we got in the shape and ending up getting where we were.  I mean, ICI will take
responsibility.  I got us there.  But weCI had workedCI had
worked a way out of it, but ICbut ICwithout
her signature, it wouldn=t
happen.

 








Michael admitted that he had not given the
mortgage company any money, paid child support since May 2006 ($4,153), paid
the attorney=s fees he
had been ordered by the court to pay Carla=s previous attorney ($1,500), or paid her current attorney=s fees pertaining to a discovery dispute ($1,000).

The record reflects that the
purpose of the final hearing was primarily to determine custody of the child
and child support.  At the beginning of
the proceeding, Carla=s attorney
stated, A[I]t=s my
understanding . . . that we have an agreement with regards to the community
estate[,] which at this point is very nominalCthere is not much left.@  Michael replied, AWe=re not in
agreement if thatCif she doesn=t say yes to that . . . .  I=m not going to give her all of that if she doesn=t agree to no child support.@  During Carla=s testimony, she requested that Michael be required to pay the $830
per month child support that he had apparently been ordered to pay before the
final hearing.[4]  She also testified that the proceeds from the
sale of the house, $34,851.47, and her car, a 1997 Pontiac Transport minivan,
were the only community assets left at that point.  

The following exchange
occurred during Michael=s testimony:








Q.     Is there any item of property that we have not talked about here
that needs to be divided, personal property or real estate?

 

A.     I didn=t getCI
didn=t get
anything out of the house, so I don=t know what allCshe
loaded up everything.  I was unable to
get back in the house.

 

. . . .

 

Q.     [Are] there any items that we have not divided or something that
you want or something that hasn=t been discussed, something
of value that we need to address here with the Court today?

 

A.     No.  She can have it all.

 

Q.     And your only objection to her having the money that=s in
the registry of the court is that you don=t want to pay child
support?  Is that correct?

 

A.     Yes or no?  That=s
correct.

 

Q.     That is correct?

 

A.     That=s
correct.

 

In his closing argument, Michael again asserted, A[L]ike I said, I am willing to let her have theCthe funds from the house if there is no child support payments.@








Notwithstanding any waiver by
Michael of objections to the trial court=s division of the community property during the final hearing, the
trial court was entitled to believe Carla and to disbelieve Michael with regard
to the existence and expenditure of any 401(k) benefits.  Furthermore, the remaining testimony at the
final hearing provided it with ample justification to award the remaining
assetsCCarla=s car and
the proceeds from the sale of the family home, to Carla.[5]  We overrule Michael=s fifth point.

IV.  Child Support

In his second point, Michael
complains that the trial court erred by ordering him to pay $830.60 per month
in child support because the evidence does not support a finding that he had
the income to be ordered to pay that much per month in child support.  He also contends that there is insufficient
evidence to support the necessary finding that he is intentionally unemployed
or underemployed.  In his third and
fourth points, he complains that the trial court erred by awarding to Carla
over $8,000 in attorney=s fees, and
by finding that these attorney=s fees were additional child support.

 

 








A. Standard of Review

A trial court has discretion
to set child support within the parameters established by the child support
guidelines set forth in the family code. 
Rodriguez v. Rodriguez, 860 S.W.2d 414, 415 (Tex. 1993); In re
Z.B.P., 109 S.W.3d 772, 781 (Tex. App.CFort Worth 2003, no pet.).  A
trial court=s decision
in this regard will not be overturned unless a clear abuse of discretion is
shown.  Rodriguez, 860 S.W.2d at
415.  We will not revise the trial court=s judgment merely because we consider the amount of the child support
award either too high or too low.  In
re P.J.H., 25 S.W.3d 402, 405 (Tex. App.CFort Worth 2000, no pet.).  And,
absent an abuse of discretion, we will not disturb the award of attorney=s fees in a divorce case or suit affecting the parent-child
relationship.  See Tex. Fam. Code
Ann. ' 106.002(a) (Vernon Supp. 2008); Samara v. Samara, 52 S.W.3d
455, 458 (Tex. App.CHouston [1st
Dist.] 2001, pet. denied). 

B. Monthly Child Support








The trial court may order
either parent to support a child in the manner specified by the order until the
child is eighteen years of age or until graduation from high school, whichever
occurs later.  Tex. Fam. Code Ann. ' 154.001(a)(1) (Vernon Supp. 2008). 
The child support guidelines set out the method of calculation based on
information a party is required to furnish with regard to his net resources and
ability to pay child support, including copies of income tax returns for the
prior two years, a financial statement, and current pay stubs.  See id. '' 154.061_.063 (Vernon 2002).  In the
absence of such evidence, the court shall presume that the party has wages or
salary equal to the federal minimum wage for a forty-hour week.  Id. ' 154.068.  Under the
guidelines, support for one child should be 20% of the party=s net resources.  Id. ' 154.125. 

If the party=s actual income is significantly less than what he could earn because
of intentional unemployment or underemployment, the trial court may apply the
support guidelines to the party=s earning potential.  Id. ' 154.066.  But for a trial
court to find that a parent is intentionally underemployed or unemployed, there
must be evidence that the parent reduced his income for the purpose of
decreasing his child support payments.  P.J.H.,
25 S.W.3d at 405_06.  There is no presumption
that simply because a parent is no longer as lucratively employed as he was
during his marriage, he is intentionally underemployed or unemployed.  Id. 
The requisite intent or lack thereof, however, may be inferred from such
circumstances as the parent=s business reversals, business background, and earning potential.  Id.








There was limited testimony
at the final hearing on the issue of Michael=s employment.  Carla testified
that she believed her husband was intentionally underemployed because Awith his experience and his training and his qualifications, he could
have had another job if he had wanted to.@  She further testified that he
had testified at a previous hearing that he was spending $350 weekly on Ascratch-off[]@ lottery
tickets.  Michael testified that he was
unemployed and that he was capable of making $650 a week at the time of trial,
but that nobody had offered him anything. 
He testified that he was receiving unemployment, that there was nothing
available employment-wise for him at the salary that he had received at the
time he was laid off from his job of twenty-five years, and that he probably
could make $650 a week as an estimator, approximately $2,816 per month.

Michael=s highest income year prior to his termination was 2003, when he
earned $87,580; he made $77,200 in 2004. 
According to Michael=s affidavit of net worth, filed January 5, 2007, he was unemployed,
living with his parents, and had no income as his unemployment compensation had
ended.  The trial court set base child
support at $830.60 a month plus $100 a month toward insurance.  This figure would have necessarily been based
on assumed gross earnings of about $4,150 a month or about $49,800 per
year.  See Tex. Fam. Code Ann. ' 154.125.  








We have not been favored with
the transcript of the prior hearing, and there is no evidence in the record
with regard to how the trial court reached the $830.60 figure.[6]  Based on the evidence that is before us,
however, it can be distilled to three basic facts: (1) Michael previously
earned in the $77,000_$86,000 range; (2) Carla felt he could be employed if he wanted to be;
and (3) Michael testified that he could make about $33,800 a year as an estimator,
his previous job.  Based on the
foregoing, and in the absence of any evidence to support the calculation of the
trial court=s $830.60
figure, and the absence of any evidence that Michael reduced his income for the
purpose of decreasing his child support payments, we hold that the trial court
erred in setting child support at $830.60 a month.  We sustain Michael=s second point. 

C. Attorney=s Fees & Child Support Enforcement








Michael complains both about
the award of additional attorney=s fees and the lack of evidence to support them.  However, although he complains that Carla=s attorney did not testify about how many hours she worked or what
amount of the fees were attributable to the child support issue, there is no
rigid requirement that the number of hours or the hourly rate must be
introduced into evidence to support a finding that attorney=s fees are necessary and reasonable. 
Brockie v. Webb, 244 S.W.3d 905, 909 (Tex. App.CDallas 2008, pet. denied);

Hagedorn v. Tisdale, 73 S.W.3d 341, 354 (Tex. App.CAmarillo 2002, no pet.).

Furthermore, Carla=s attorney did testify that she charged $200 per hour, that her
paralegal charged $100 per hour, and that, not including the time spent at the
hearing, Carla had incurred $8,203.50 in legal fees in the case.[7]  The principal issues in the case were the
payment of child support and the disbursement of proceeds from the sale of the
house.  Carla=s attorney testified that the fee was reasonable based on the time and
labor required, the preclusion of other employment, the fee customarily charged
in Denton County for similar legal services, the time limitation imposed by the
parties or the circumstances, and the nature and length of her professional
relationship with Carla.[8]  Based on this information, the trial court
could have concluded that Carla=s attorney=s fees were
reasonable.

Additionally, in a hearing
with regard to the payment of child support,








If the court finds that the
respondent has failed to make child support payments, the court shall order the
respondent to pay the movant=s reasonable attorney=s fees and all court costs in addition to the arrearages.  Fees and costs ordered under this subsection
may be enforced by any means available for the enforcement of child support,
including contempt.

Tex. Fam. Code Ann. ' 157.167(a) (Vernon Supp. 2008). 
Therefore, if the trial court could have reasonably concluded that the
hearing=s primary purpose was to enforce Michael=s obligation to pay child support and it found that Michael had failed
to make child support payments, then it had no discretion but to order Michael
to pay Carla=s reasonable
attorney=s fees unless it also found that there was good cause for his failure
to pay.  See id. ' 157.167(a) & (c). 

At the conclusion of the
hearing, the trial court stated,

I am also going to award
$8,200 in additional attorney=s fees.  And I am going to makeCI find that those are directly related to the establishment andCand collection of child support and make that an additional child
support obligation, because I think that=s what the hearing was about today is him not wanting to pay child
support.  So that extra $8,200 is
directly related to the child support, and I so find and order that [it] be
paid at another $100 a month as additional child support until that $8,200 is
discharged.








Although Michael contends
that the evidence did not support the trial court=s award or its finding that the fees should be awarded in the nature
of additional child support, the record reflects that the heart of the case
involved the question of child support. 
As previously addressed above, Carla=s attorney informed the trial court that the hearing=s purpose was Awith regards
to custody of the child and child support,@ to which Michael replied, AI=m not going
to give her all of that if she doesn=t agree to no child support.@








In addition to her other
testimony, Carla testified that Michael stopped paying child support when he lost
his job and, by the time of the hearing, had not paid any for five months.  Carla replied, Ayes,@ when her
attorney asked, ASo are you
requesting that your husband be required to pay the $830 a month in child
support like he was ordered before?@  Child support and insurance
for their child were among the other items Carla requested, which were a
divorce, award of her vehicle, the $34,851.47 in the court=s registry, and approval of the final parenting plan.  Michael did not deny failing to pay child
support and just claimed that he did not have enough money.  As previously addressed, Michael testified
that his only objection to Carla having the $34,851.47 is that he did not want
to pay child support, and in his closing argument, he again indicated that he
was willing to let Carla have the $34,851.47 as long as he did not have to pay
child support.[9]  Under these circumstances, we cannot say that
the trial court=s actions in
awarding $8,200 in attorney=s fees to Carla or in finding that they were additional child support
were so arbitrary or unreasonable as to amount to an abuse of discretion.  Therefore, we overrule the remainder of
Michael=s third and fourth points.

V. Conclusion 

Having sustained Michael=s second point, we reverse and remand this point to the trial court to
recalculate the amount of child support Michael is required to pay.  Because we overrule the remainder of Michael=s points, we affirm the rest of the trial court=s judgment. 

 

PER CURIAM 

PANEL: 
MCCOY, J.; CAYCE, C.J.; and HOLMAN, J.

DELIVERED: September 25, 2008











[1]See Tex.
R. App. P. 47.4.





[2]Carla apparently started to testify
to this, stating AWe presented ourselfC,@ but she was cut off by Michael.





[3]Carla=s exact testimony was:

 

His plan was to leave me with
nothing.  He felt that I deserved
nothing, and he was going to make sure I had nothing. . . . He=s made life hell.  I mean, he quit paying all of our bills.  WeCmy son [C.A.R.] and I[C] had to move out of our house.  It was 20 degrees outside.  We had no electric.  We have had no phone. . . . No
groceries.  He drained all the
accounts.  He did away with everything. .
. . Did nothing to get our house out of foreclosure.  In a total of three and a half months,
[C.A.R.] and I received $170 cash. 

 





[4]We note Aapparently@ because the record is incompleteCthere were no transcripts of any
other hearings included in the record.





[5]Michael does not challenge the
trial court=s finding that he Awas spending $350.00 on lottery
tickets each week while not paying his court ordered child support@; the finding that he ceased to
support his family in August 2005, including child support, house payments, car
payments, phone and utilities; or the finding that he received a check for
$1551.00 for an insurance claim for damage to the family home, endorsed, and
cashed the check and utilized the funds for his sole use and benefit, leaving
Carla to pay the contractors at the sale of the family home.





[6]The trial court asked Carla=s attorney during closing arguments
about how she came up with the $830.60 that she requested for child
support.  She replied, AThe [$]830 I had come up with, Your
Honor, was what the Court had found at the last hearing.@ 
Although we must presume that a partial reporter=s record designated by the parties
constitutes the entire record, the record here reflects that there was nothing
before the trial court to support its conclusion.  See Tex. R. App. P. 34.6(c)(4).





[7]Based
on the amount the attorney testified that she and her paralegal charged, this
total would amount to either forty-one hours of attorney-time, eighty-two hours
of paralegal-time, or some combination thereof. 






[8]Michael made no objections during
Carla=s attorney=s testimony and opted not to
perform any cross-examination during the hearing on the attorney=s fees issue.





[9]During Michael=s closing argument, the trial court
asked, ASo you think I ought to award her
all the property and . . . just set child support at zero?@ Michael replied, AYes, sir . . . that=s fine with me.@