In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-18-00385-CV
_____

GEORGE EARL DANNER, Appellant

V.

KATHRYN M. DANNER, Appellee

On Appeal from the 418th District Court
Montgomery County, Texas
Trial Cause No. 17-03-04143-CV

MEMORANDUM OPINION

Dissatisfied with the manner the trial court divided the parties' property in his divorce, George Earl Danner appeals and complains the trial court erred (1) by holding the Partition or Exchange Agreement (the Agreement) unenforceable after finding that Kathryn M. Danner did not sign it voluntarily; (2) by holding the Agreement unenforceable after finding it unconscionable; (3) by treating certain assets—several brokerage accounts that George inherited from his parents—as

community property when the evidence allowed the trial court to trace the accounts and categorize them as separate property; (4) by considering fault in dividing the parties' marital estate when the court granted the divorce on one of the no-fault grounds for divorce; and (5) by granting Kathryn's request for an award of attorney's fees when the evidence she presented is insufficient to show the amounts awarded were reasonable and necessary and when the court failed to make the awards conditional on George's losing should he appeal. We hold the trial court erred by failing to make the awards for attorney's fees, if George elects to appeal to the Texas Supreme Court, conditional on his failure to prevail in those appeals. Because his remaining issues lack merit, we reform the award to correct the trial court's error and affirm the judgment as reformed.

## Background

George and Kathryn married in the early 1990s. In March 2017, Kathryn sued George seeking a divorce. In her petition, Kathryn claimed the marriage had become insupportable due to discord of a conflict in personalities that destroyed the legitimate ends of their marriage. Kathryn also alleged she should receive a disproportionate share of the couple's community estate for two reasons, the differences in what they earn in their occupations and George's fault in breaking up the marriage. Kathryn also disputed the validity of the Agreement, alleging that

2

George committed actual or constructive fraud by forging her name on the Agreement's signature page.

George filed a general denial in response to Kathryn's suit. Later on, he filed a counterclaim. In his counterclaim, George alleged Kathryn was guilty of adultery and that, in January 2016, she signed the Agreement partitioning the property the couple acquired during their marriage. The Agreement contains schedules describing the community and separate property that the couple acquired during their marriage. In these pleadings, George claimed he was entitled to a disproportionate share of the couple's community property.

Kathryn filed a verified answer to George's counterclaim.[1] In her answer, Kathryn denied she executed the Agreement. She also denied that anyone had executed the Agreement on her behalf. But Kathryn did not personally sign the verification that was included in her answer. Instead, Kathryn's attorney signed it, asserting that the facts that Kathryn alleged in her answer "are within [Kathryn's]

---

[1] Kathryn's attorney signed a verification that accompanied her answer. The verification, which was signed by Kathryn's attorney, states that the facts stated in the verified answer "are within [the] client's personal knowledge and are true and correct." George did not specially except to the form of the verification that Kathryn used in her answer, and he also never obtained a ruling in the trial court on his complaint that the form of the verification was defective based on his claim that the person who signed it did not declare, under penalty of perjury, that every statement in the answer was within the attorney's personal knowledge and true and correct. In his brief, George argues that Kathryn failed to verify the answer.

3

personal knowledge and are true and correct." At no time, either before or during the trial, did George ever except or object to the form of the verification that accompanied Kathryn's answer to his counterclaim.

The issues contested in the appeal hinge largely on arguments about the enforceability of the Agreement and whether the final judgment represents a fair division of the parties' marital estate. The trial court resolved the parties' arguments on these matters in two hearings, both to the bench. The court held the first hearing in December 2017, and the second occurred in June 2018. During the December 2017 hearing, the court addressed the parties' arguments over the validity and enforceability of the Agreement that George asserted Kathryn signed. At the start of that hearing, the parties stipulated to several facts pertinent to the issues in the appeal, which we have paraphrased:

1. The attorney George hired to draft the Agreement never met or spoke with Kathryn at any time material to the issues in dispute;

2. The attorney George hired to draft the Agreement never met or spoke to Kathryn's attorney at any time material to the issues in dispute;

3. The attorney George hired to draft the Agreement knows nothing about any negotiations between George and Kathryn relevant to the issues in dispute;

4. There are no signature lines on page 48 of the Agreement for George and Kathryn to sign. Instead, page 48 of the Agreement is the page the notary was to sign in four separate places;

4

5. After discussing the initial draft of the Agreement with George, the attorney George hired to draft the Agreement sent George a second draft. Neither George, nor the attorney, said anything in these conversations signifying that either thought the second draft of the Agreement was intended to function as the final draft of the Agreement.

Five witnesses testified in the December 2017 hearing: (1) George, (2) Kathryn, (3) Becky Ward (the notary who notarized the verification page to the Agreement), (4) Curtis Baggett (Kathryn's forensic documents examiner), and (5) Dale Stobaugh, (George's forensic documents examiner). We discuss the testimony of these five witnesses only if it is relevant to the arguments the parties raised in the briefs they filed in the appeal.

During the first hearing, George testified he observed Kathryn sign the Agreement. According to George, after Kathryn signed the Agreement's signature page, she took the Agreement to a notary. Kathryn then "brought it back to [him] the next day." Kathryn, however, disputed George's testimony claiming she signed the Agreement, whether while George was present or ever. Instead, Kathryn testified she never signed the Agreement and never saw it before she sued George for a divorce.

That said, Kathryn acknowledged she signed the notary page that appears at page forty-eight of the Agreement George introduced into evidence in the trial. Kathryn suggested the signature of her name that appears on the Agreement's

signature page, page forty-seven of the document admitted into evidence in the trial, was forged. And Kathryn explained during the trial why her signature is on page forty-seven, the notary page to the Agreement admitted in the trial. According to Kathryn, one morning, while she was on her way to work, George said: "Hey, can you get this notarized where the little sticky notes are?" Kathryn testified she took the page to Becky Ward, a co-worker, because Kathryn knew Becky was a notary. Kathryn explained she signed the notary page and had no other pages of any documents with her when she signed the notary page before Ward.

The number "48" appears in the upper right-hand corner of the notary page. The language on the notary page also shows that Kathryn signed on a line that should have been signed by a notary. Just below where Kathryn signed her name to page forty-eight, the notary page has language, which states "the notary public whose signature appears above" certifies that the notary "[is] not an attorney representing either party to this agreement."

During his testimony, George addressed why he decided to ask Kathryn to sign an agreement partitioning the assets they acquired during their marriage, which the Agreement sets out in four schedules, Schedules A-D. According to George, after learning that Kathryn was having an affair, he and Kathryn began discussing the state of their marriage in August 2015. Based on these discussions, George decided

6

he should unilaterally retain an attorney to draft an agreement to "protect[] certain assets" in case of a divorce. In late December 2015, George retained an attorney for that purpose. Based on the language in the Agreement, George wanted Kathryn to agree to treat all the assets in the accounts into which he deposited the assets he inherited from his parents in 2009 as his separate property. George agreed that he confronted Kathryn with the Agreement one day after he had a draft of the agreement in hand so that he could get her to "sign it immediately" without negotiating any of its terms. According to George, Kathryn signed the Agreement and they continued living together until Kathryn sued him for a divorce.

To support her claim she signed only the notary page and nothing else, Kathryn called Ward, who signed page forty-eight as a notary, to explain what happened the day Ward signed that page. Ward testified Kathryn gave her the notary page to notarize but had no other pages of any agreement with her that day. Ward then notarized page forty-eight at Kathryn's request on January 8, 2016. Kathryn signed the page in her presence. Ward acknowledged that she also should have signed the line that Kathryn signed on the page she notarized. According to Ward, she and Kathryn did not know that notary page was part of the larger, fifty-eight-page Agreement. Ward also acknowledged that she never saw George sign the

notary page even though she signed as a notary, representing she had notarized his signature that day.

Both parties also presented testimony from forensic document examiners. The forensic document examiners provided conflicting opinions about whether Kathryn's signature on page forty-seven of the Agreement is authentic. Both of the document examiners compared known examples of Kathryn's signature to the signature that appears on page forty-seven, the Agreement's signature page. Based on the comparisons he made of the signature that appears at page forty-seven, known examples of Kathryn's signature used for comparison, and his training, Curtis Baggett, Kathryn's expert, testified that Kathryn did not sign the Agreement anywhere except at page forty-eight, the notary page to the document George offered in the trial.

George's expert—Dale Stobaugh—followed a technique much like the one Baggett used to evaluate the authenticity of Kathryn's signature. But Stobaugh reached a different conclusion than Baggett about whether Kathryn's authentic signature is on page forty-seven. According to Stobaugh, "there is a strong probability or strong indication the signatures [on the Agreement] are attributable to Kathryn[.]" At the end of the December hearing, the trial court issued an interlocutory ruling finding the Agreement "unenforceable."

In June 2018, the parties tried the remaining issues to the bench. In the June 2018 hearing, the trial court heard evidence relevant to the division of the parties' marital estate and to their dispute over whether George had handled the assets he inherited from his parents in a manner that allowed the accounts to retain their character as his separate property. Seven witnesses testified in this part of the trial: (1) Kathryn; (2) George; (3) Robert Clements (Kathryn's attorney, who testified about the reasonableness of the fees he charged Kathryn while representing her in the case and the fees he expected Kathryn to incur should George appeal); (4) Ann Sandoval (Kathryn's and George's friend, who testified that Kathryn didn't know anything about her family's finances); (5) Grayson Danner (the couple's son, who testified that, about five years earlier, he discovered Kathryn was having an affair); (6) Ryan Breaux (who testified his father had an affair with Kathryn, which started in 2015); and (7) Virginia Hagans (George's sister, named as executor of her parents' estates after they died on the same day in 2009).

Most of the testimony in the June hearing focused on the parties' claims alleging the other was at fault in breaking up the marriage. George produced some but not enough evidence to persuade the trial court to support his claim that the brokerage accounts into which he claimed he placed the assets he inherited from his parents should be characterized as his separate property. For instance, George called

9

Hagans, his sister, who testified that she and George inherited various assets from their parents when they died in 2009. As the executor, Hagans testified she directed the bank and brokerage firms to send George his share of the assets from those accounts. But when George's attorney offered an exhibit supporting Hagans' testimony tracing the money from the accounts Hagans controlled into the accounts George claimed the assets were deposited, Kathryn's attorney objected, explaining the documents George was offering had never been properly authenticated or produced. The trial court sustained Kathryn's objections to the exhibit. After that, Hagans testified that her parents had a brokerage account, an IRA, and a checking and savings accounts when they died. According to Hagans, the checking and saving account had $24,216 in it when her parents died.[2] She valued the brokerage accounts at just over $900,000, and she explained she instructed the financial institutions holding the estate's assets to transfer George's share to him. According to Hagans, these financial institutions transferred George's share of the assets he inherited from his parents to him in August 2009. When George testified, he provided the trial court an inventory to support his allegation claiming he had inherited $534,048 in assets from his parents.

---

[2] To simplify the math, we have summarized the testimony and rounded up any figures Hagans described in her testimony to the nearest whole number.

During the trial, George acknowledged he did not have the deposit slips needed to trace the source of the money from the brokerage firms controlled by Hagans as the executor of his parents' estates to the accounts he used to handle the inherited assets upon their transfer. Instead, George testified the court "would have to just take [his] word for it" about the source of the funds he placed into those accounts. George also agreed that he did not have the monthly account statements related to the accounts he testified he established to handle the assets he inherited from his parents in 2009. George also agreed that the documents he had provided in the trial were insufficient to allow the court to trace what parts of the assets in his brokerage accounts consisted of interest and dividend income, paid on the assets he inherited in 2009, and what parts of the accounts consisted of the corpus of the assets he acquired from his parents in 2009.

Both parties presented evidence of fault in the June 2018 hearing. Kathryn presented evidence that George had done various things that damaged her relationship with the couple's children. Kathryn also relied heavily on the evidence we have already described about the manner George handled the couple's assets after 2015, when George learned she was involved in an extra-marital affair. Kathryn also presented testimony showing she could not earn as much as a teacher as George has historically earned as a businessman. According to Kathryn, she makes between

11

$45,000 to $55,000 annually. Other evidence shows George makes around seven times more.

George also presented evidence to support his claim of fault. He called Ryan Breaux and Grayson Danner to testify to their knowledge about Kathryn's extra-marital affairs. We need not detail the testimony, however, since George has raised no issues claiming the judgment should be reversed because the trial court failed to find Kathryn at fault is against the greater weight and preponderance of the evidence admitted in the trial.

In September 2018, the trial court granted the divorce and signed a judgment dividing the parties' community property. The decree reflects the trial court granted the divorce "on the ground of insupportability." The court confirmed that George owned some assets, 339 acres of property in Louisiana, he inherited from his parents as separate property. Yet the court ruled the bank and brokerage accounts, the accounts George is claiming include the assets he inherited from his parents, are community property. The trial court followed the just and fair method in dividing the parties' community property and debts. Based on the values George assigned to the various assets he included in his inventory, the judgment reflects the trial court awarded George just under 54% of the property the trial court characterized as the community property the couple acquired during their marriage. The trial court also

ordered that George pay Kathryn $60,000 in attorney's fees for the trial, attorney's fees of $40,000 "for attorney's fees on appeal[,]" $5,000 more should George file a petition for review, and $15,000 more should the Texas Supreme Court grant George's petition for review.

After the trial court signed the judgment, George asked the trial court to provide the parties with the court's written findings. When the trial court complied with his request, it did not provide the parties with findings reflecting the values the court placed on the various assets of the marital estate. We rely on these findings, among others, in resolving the arguments that George has presented in his appeal:

> 1.     Many portions of [George's testimony] were found to be incredible.

> 2.     Except for the one signature on [the notary page], the Agreement does not contain any genuine signatures or initials of [Kathryn].

> 3. The document entitled *Partition or Exchange Agreement* ("Agreement") allegedly executed on or about January 8, 2016 is not valid.

> 4. [Kathryn] has disputed the authenticity of all her initials and signature in the Agreement (except [the notary page]), and [George] has not met his burden of proof in establishing the authenticity of any signatures in the Agreement.

> 5. The original signature of [Kathryn] on [the notary page] is the only authenticated signature and it does not bind her to the substance of the terms contained in the Agreement.

6. The Agreement is neither valid, nor enforceable, pursuant to Section 6.6015 of the Texas Family Code.

7. Many portions of [George's] testimony [are] incredible.

8. [George's] income is far in excess of [Kathryn's] income.

9. There is substantial disparity in income and earning potential between the parties.

10. [George's] fault justifies an unequal division of the community estate.

11. All the assets listed in the *Final Decree of Divorce* (except those specifically identified as separate property) were accumulated during the marriage and were community property assets.

12. The division of the estate of the parties as ordered in the *Final Decree of Divorce* signed on September 7, 2018, is just and right having due regard for the rights of each party.

13. [George] was unable to trace, identify or provide sufficient documents for the Court to trace or identify any specific assets in which [George] is claiming a separate property interest, with the exception of those specifically identified as [George's] separate property in the *Final Decree of Divorce*.

14. [Kathryn] is entitled to her attorney's fees as previously awarded in the Court's temporary orders and as agreed to by the parties in the Mediated Settlement Agreement, plus an additional sixty thousand dollars ($60,000.00) for [Kathryn's] attorneys' work in the trial court, plus an additional forty thousand dollars ($40,000.00) if a Notice of Appeal is filed to the Court of Appeals, plus an additional five thousand dollars ($5,000.00) if a Petition for Review is filed to the Texas Supreme Court, plus an additional fifteen thousand dollars ($15,000.00) upon acceptance of the appeal by the Texas Supreme Court.

15. With the exception of the property specifically identified as [George's] separate property in the *Final Decree of Divorce*, [George] has failed to prove any separate property interest in funds by 'clear and convincing' evidence.

## Standards of Review

Most of George's complaints concern whether legally and factually sufficient evidence supports the trial court's findings.[3] "When a party attacks the legal sufficiency of an adverse finding on an issue on which [he] has the burden of proof, [he] must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue."[4] In our review of a finding challenged for legal sufficiency, we consider the evidence "in the light most favorable to the verdict, and indulge every reasonable inference that would support" the finding the appellant has challenged.[5] "But if the evidence allows only one inference," we may not disregard the evidence when deciding where legally sufficient evidence supports the finding the appellant has challenged in his appeal.[6] As applied to George's appeal, the standard of review requires that we credit the evidence favoring the trial court's

---

[3] *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996) ("A trial court's findings of fact are reviewed for factual sufficiency of the evidence under the same legal standards as applied to review jury verdicts for factual sufficiency of the evidence.").

[4] *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam) (citing *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989)).

[5] *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005).

[6] *Id*.

finding that Kathryn never signed the Agreement[7] unless the evidence the trial court considered in resolving the dispute establishes the finding is unreasonable.[8] Stated another way, we disregard evidence that contradicts the trial court's findings that George challenges unless the trial court, based on the evidence, only had one choice—to find in George's favor on the findings he challenges in his appeal.[9]

Largely, George suggest the evidence is factually insufficient to support the trial court's findings. When a party attacks the factual sufficiency of the evidence on an issue on which he had the burden of proof, he must "demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence."[10] In a factual sufficiency review, we examine all the evidence and view it in a neutral light.[11] But unless the evidence is so weak or the trial court's finding is clearly wrong and unjust given the greater weight and preponderance of the evidence, we cannot set the finding the appellant challenges aside when resolving the appeal.[12] In other words, we cannot substitute our judgment for the factfinder's if the evidence

---

[7] Among its written findings, the trial court found that "[e]xcept for the one signature on [the notary page], the Agreement does not contain [Kathryn's signature]."

[8] *See Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006).

[9] *Id.*

[10] *Dow Chem. Co.*, 46 S.W.3d at 242.

[11] *Id.*

[12] *Id.*

supports the finding the appellant challenges in the appeal.[13] In a factual sufficiency review, we will not set aside the finding the appellant challenges in the appeal unless "the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust."[14]

In his appeal, George complains the trial court erred by finding that certain brokerage accounts, the accounts he claims received the assets he inherited from his parents, were community rather than his separate property in dividing the marital estate. In family law cases, insufficient evidence arguments are, generally speaking, not treated as independent grounds of error; instead, complaints the evidence does not support a finding factors into the appellate court's review of whether the trial court made a just and right division of the parties' marital estate.[15] When dividing a couple's marital estate, trial courts have a statutory duty to "order a division of the estate of the parties in a manner that the court deems just and right, having due regard for the rights of each party and any children of the marriage."[16] Trial courts may

---

[13]*See In re H.R.M.,* 209 S.W.3d 105, 108 (Tex. 2006) (factual sufficiency); *see also In re J.L.*, 163 S.W.3d 79, 86-87 (Tex. 2005) (legal sufficiency, recognizing fact-finder "sole arbiter when assessing the credibility and demeanor of witnesses").

[14]*Dow Chem. Co.*, 46 S.W.3d at 242. *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).

[15]*Murff v. Murff*, 615 S.W.2d 696, 699 (Tex. 1981); *Reddick v. Reddick*, 450 S.W.3d 182, 187 (Tex. App.—Houston [1st Dist.] 2014, no pet.).

[16] Tex. Fam. Code Ann. § 7.001.

consider for several factors in dividing a marital estate, including the disparity of incomes and earning capacities of the parties, the benefits that a spouse would have derived from the marriage had it continued, each spouse's "business opportunities, education, relative physical conditions, relative financial condition and obligations, disparity of ages, size of separate estates, and the nature of the property."[17] While these factors allow a trial court to exercise significant discretion in arriving at a fair division, however, they do not allow trial courts the discretion to divest a spouse of that spouse's separate property in dividing the couple's marital estate.[18]

In Texas, trial courts start with a presumption that all property either spouse acquired while married to the other spouse is community property.[19] Overcoming the community presumption requires the party who claims an asset is separate property to "present clear and convincing evidence" sufficient to allow the court to characterize that asset as that spouse's separate property.[20] Thus, George had the burden in the trial to provide the trial court with clear and convincing evidence sufficient to allow the trial court to trace the bank and brokerage accounts he claims contains the assets he inherited to allow the trial court to characterize that part of the

---

[17] *Murff*, 615 S.W.2d at 699.

[18] *Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 141-42 (Tex. 1977).

[19] *See* Tex. Fam. Code Ann. § 3.003; *Garza v. Garza*, 217 S.W.3d 538, 548 (Tex. App.—San Antonio 2006, no pet.).

[20] *Garza*, 217 S.W.3d at 548.

assets in those accounts as his separate property.[21] Thus, George needed evidence establishing the origin of deposits that he placed in the accounts he claimed he used to accept the assets his sister, as executor, transferred to him after George's parents died.[22] While George testified that he placed the assets he inherited from his parents in several brokerage accounts, the trial court did not have to believe his testimony about the origin of those funds.[23] And even when one spouse acquires property through an inheritance, separate property which is commingled with community property requires the spouse claiming that a commingled account contains his separate property to provide the court with sufficient evidence to segregate the community asset in the account from those that are the spouse's separate property. Without such evidence allowing the court to determine the origin and segregate any commingled assets, the presumption that everything in the account is community property will prevail.[24]

When the appellant complains the trial court abused its discretion because it did not fairly divide the couples' marital estate, which George argues in part, we will not overturn the division the trial court made of the property if the record

---

[21] *Id.*
[22] *Boyd v. Boyd*, 131 S.W.3d 605, 612 (Tex. App.—Fort Worth 2004, no pet.).
[23] *Garza*, 217 S.W.3d at 548.
[24] *Id.*

19

contains some evidence of a substantive and probative character supporting it.[25] We review the division in this way because in family law cases, the abuse-of-discretion standard overlaps with the traditional legal and factual sufficiency standards of review. Thus, legal and factual sufficiency issues are not independent grounds for asserting error, but are factors relevant to the appellate court's evaluation of whether an abuse of discretion occurred.[26] To decide whether an abuse of discretion occurred, we consider whether the trial court (1) had sufficient evidence to exercise its discretion and (2) erred in exercising that discretion.[27] The first part of this two-part test focuses on whether the ruling the trial court made is supported by sufficient evidence.[28] In a case in which some evidence supports the trial court's ruling, the second part of the test requires the appellate court to determine whether that evidence, after considering the evidence as a whole, shows the ruling the trial court made is one that was reasonable.[29]

---

[25] *Hinton v. Burns*, 433 S.W.3d 189, 193 (Tex. App.—Dallas 2014, no pet.) (citing *Moroch v. Collins*, 174 S.W.3d 849, 857 (Tex. App.—Dallas 2005, pet. denied)).

[26] *Hinton*, 433 S.W.3d at 193; *Moroch*, 174 S.W.3d at 857; *see also In re A.B.P.*, 291 S.W.3d 91, 95 (Tex. App.—Dallas 2009, no pet.) (discussing standard).

[27] *Hinton*, 433 S.W.3d at 193-94; *In re A.B.P.*, 291 S.W.3d at 95.

[28] *Hinton*, 433 S.W.3d at 194; *Moroch*, 174 S.W.3d at 857.

[29] *Id.*

Partition Agreement

In George's first two issues, he argues the evidence is insufficient to support the trial court's findings that the Agreement is unenforceable. In resolving the arguments George presents to support these issues, we focus on whether the trial court's ruling that Kathryn did not sign the agreement is one that was reasonable based on the evidence admitted in the trial, since that finding—without more—offers sufficient factual support for the trial court's refusal to enforce the Agreement.[30]

When a married couple decides to partition the property they have acquired during their marriage, they may designate certain property, even though it is community property, and agree they want the designated property treated as a spouse's separate property.[31] Each spouse must consent to partition the property in partitioning marital assets before the agreement will be enforced.[32] Here, the trial court found Kathryn never signed the agreement. And in the trial, George had the burden of proof on the issue of whether Kathryn's signature is on the signature page, page forty-seven, of the Agreement.[33] As the party with the burden of proof who has

---

[30] *See* Tex. Fam. Code Ann. § 4.104 (requiring agreements to partition property in a marriage to be in writing and signed by both parties).

[31] *Id.*

[32] *Tex. Farmers Ins. Co. v. Murphy*, 996 S.W.2d 873, 881 (Tex. 1999).

[33] *See* Tex. Fam. Code Ann. § 4.104. We note that George also argues the trial court erred by finding in Kathryn's favor on Kathryn's affirmative defenses raising issues of whether she voluntarily signed the agreement and by finding the agreement

appealed and complains of the adverse finding, George must show that either the evidence in the trial conclusively established Kathryn signed the agreement, or that the evidence the trial court relied on to conclude Kathryn never signed the Agreement is so weak it is outweighed by the greater weight and preponderance of the evidence admitted in the trial.[34]

In part, George suggests that Kathryn cannot now argue she never signed the Agreement because her verified answer was defective because it was signed by her attorney, who represented that he signed it based on what she said.[35] While the verification with Kathryn's answer might be defective, her answer still placed George on notice that she was claiming she never executed the Agreement and that her signature was forged. Moreover, George never objected and obtained a ruling on the claim he raises in his appeal claiming the verification Kathryn filed with her answer is defective. And when Kathryn and Baggett in the trial, both testified, without objection, that Kathryn's never signed the Agreement. We conclude that

---

is one that is unconscionable. *See id*. § 4.105(a)(1), (2). We need not reach these arguments, however, given our resolution of George's first two issues.

[34] *See Dow Chem. Co.*, 46 S.W.3d at 242.

[35] *See* Tex. R. Civ. P. 93 (requiring certain pleas to be verified, including that the party did not execute an instrument on which the pleadings are founded).

George waived his right to rely on the argument he raises in his appeal claiming Kathryn filed a defective verification with her answer.[36]

Next, we examine the merits of George's argument claiming the evidence is insufficient to support the trial court's refusal to find in his favor on his claim that Kathryn never signed the Agreement. We have already disused the evidence that shows Kathryn never signed the Agreement. As the factfinder, the trial court had the right to exercise its discretion by believing that testimony.[37] At trial, Kathryn also offered evidence, which the trial court chose to credit, explaining why her signature appears on the Agreement's notary page. Kathryn's testimony allowed the trial court to conclude that while Kathryn signed the notary page, she did not sign it knowing that George intended to attach it to an agreement partitioning the couple's marital estate. Ward's testimony provides even more support for the trial court's refusal to find the notary page the functional equivalent of the Agreement's signature page. And Baggett's testimony, Kathryn's forensic document examiner, provides even more support for the trial court's refusal to treat the notary page as the signature page to the Agreement.

---

[36] *See* Tex. R. App. P. 33.1 (requiring, as a prerequisite to presenting a complaint for appellate review, that the record show the appellant raised the complaint in the trial court through a timely request, objection, or motion).

[37] *McGalliard v. Kuhlmann*, 722 S.W.2d 695, 697 (Tex. 1986) (explaining that the trier of fact "may believe one witness and disbelieve others").

In a bench trial, the trial court is the factfinder. In that role, it acts as the sole judge of the credibility of witnesses.[38] While George and Stobaugh, George's forensic document examiner, testified that Kathryn's signature is on the signature page, the trial court had the right to attempt to authenticate Kathryn's signature during the trial.[39] We conclude the evidence does not show the trial court's decision to reject George's argument claiming Kathryn signed her name to the Agreement is insistent with the greater weight and preponderance of the evidence admitted in the trial.[40]

We reach the same conclusion on George's claim that Kathryn's signature, which appears on the notary page, bound her to perform the terms in the Agreement. The trial court, as the trier of fact, had the right to credit Kathryn's testimony claiming she never knew George intended to attach the notary page to an agreement in which she was partitioning the property acquired during her marriage to George. Nothing in the language on the notary page notifies those who read it that the page would be attached to an agreement partitioning the couple's property. We conclude the greater weight and preponderance of the evidence does not contradict the trial

---

[38] *See City of Keller*, 168 S.W.3d at 819.
[39] *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).
[40] *See Dow Chem. Co.,* 46 S.W.3d at 242; *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986).

court's conclusion that Kathryn never signed the Agreement. For that reason alone, it is unenforceable. George's first two issues are overruled.[41]

## Characterization of Bank and Brokerage Accounts

In issue three, George argues that when the trial court divided the parties' community property, it erred by characterizing the bank and brokerage accounts that included the assets he inherited from his parents as part of the couple's marital estate. In his brief, George asserts the accounts in the chart below, with partial account numbers, contain the assets that he inherited under the provisions in his parents' wills.

| Investment Account | Current Value (According to George's Inventory) |
|---|---|
| Merrill Lynch IRA #9529 | $152,465.72 |
| Merrill Lynch SEP #6494 | $110,309.92 |
| Merrill Lynch CMA #4062 | $471,253.62 |
| Merrill Lynch CMA #4061 | $69,304.99 |
| Edward Jones #74-1-7 | $613,590.49 |
| Edward Jones #21-1-0 | $1,262,240.25 |

[41] *See* Tex. Fam. Code Ann. § 4.104 (requiring partition agreements to be signed by the parties); Tex. R. App. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal.").

Under Texas law, assets owned by one spouse before marrying, acquired by a spouse from a gift, by devise, or through descent are that spouse's separate property.[42] On the other hand, except for separate property as defined in the Family Code, property that a spouse acquires while married to the other spouse is defined to be the community property, which the married couple owns.[43] Generally, the character of a specific asset, that is whether it should be treated as community or separate property when acquired during marriage, is determined by whether the asset was separate property at its inception, often called the inception of title rule.[44] Here, the parties do not dispute that George, in 2009, inherited land and assets from accounts owned by his parents when they died. But the fact there is no dispute about the fact George inherited some assets does not mean that Kathryn stipulated or agreed that George put the assets he inherited into the above-listed accounts. And George had the burden of proving the assets in these accounts came from his inheritance with clear and convincing evidence.[45] Otherwise, the trial court had to

---

[42]Tex. Fam. Code Ann. § 3.001; *Barnett v. Barnett*, 67 S.W.3d 107, 111 (Tex. 2001).

[43]Tex. Fam. Code Ann. § 3.002; *Barnett*, 67 S.W.3d at 111.

[44]*See Barnett*, 67 S.W.3d at 111 (explaining the general rule is "whether property is separate or community is determined by its character at inception").

[45] Tex. Fam. Code Ann. § 3.003(b); *Stavinoha v. Stavinoha*, 126 S.W.3d 604, 607 (Tex. App.—Houston [14th Dist.] 2004, no pet.).

26

presume the assets in the brokerage accounts contained nothing but community property since they were opened while the parties were married.[46]

"Clear and convincing" evidence means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction on the truth of the allegations sought to be established.[47] The evidence George provided is neither clear nor convincing. It's undisputed that Hagans, George's sister and the executor of their parents' estates, transferred George's share of his assets to him. But the record does not clearly show she transferred them into the above accounts. As the trier of fact, the trial court had the discretion to reject George's testimony claiming the financial institutions, at Hagans direction, placed the assets George inherited from his parents into one or more of the above listed accounts. He simply failed to provide the trial court with statements and financial records sufficient to allow the trial court to form a firm belief or conviction that the assets he inherited went into these accounts.

Next, even if we are wrong in our conclusion about the evidence showing the inception of title to the above accounts, George commingled the assets in these accounts even if we were to accept George's argument claiming that when he opened

---

[46]*See* Tex. Fam. Code Ann. § 3.003(a); *Barnett*, 67 S.W.3d at 111.

[47] *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002); *Stavinoha*, 126 S.W.3d at 607*; see also* Tex. Fam. Code Ann. § 3.003(b).

the accounts, they consisted entirely of the assets that he inherited in 2009. Because

he did so, George was also required to provide the trial court with evidence sufficient

to allow the court to trace and segregate the balances in the accounts at the time of

trial between what was his separate property and what part was owned by the marital

estate. The reason evidence tracing is required is to allow the court to segregate the

property in the accounts or to determine whether "the evidence shows that separate

and community property have become so commingled as to defy resegregation and

identification[.]"[48] When hopelessly commingled, "the community presumption

prevails."[49]

When a spouse earns income during the marriage, no matter if the income is

interest or a cash dividend on a stock owned held in an account by one spouse as that

spouse's separate property, the income is community property.[50] In trials, a trial

court may find a witness's testimony, without the benefit of financial statements

---

[48] *Irvin v. Parker*, 139 S.W.3d 705, 708 (Tex. App.—Fort Worth 2004, no pet.).

[49] *Id.*

[50] Tex. Fam. Code Ann. § 3.002 ("Community property consists of the property, other than separate property, acquired by either spouse during marriage."); *LeGrand-Brock v. Brock*, 246 S.W.3d 318, 322 (Tex. App.—Beaumont 2008, pet. denied) (explaining that cash dividends paid on stock owned by a spouse as that spouse's separate property is treated as community property when the dividends are paid during the marriage).

relevant to tracing, is insufficient to support a spouse's claim that the assets in the account is owned by that spouse as separate property.[51]

When George testified, he acknowledged the assets in the above accounts include significant dividends and interest earned on the accounts between 2009 and the date of the trial. Yet George failed to provide the trial court with the types of evidence—financial statements and records–the court needed to segregate what parts of the assets in the above accounts belonged to him as his separate property and what parts belonged to the marital estate.[52] We hold the trial court did not abuse its discretion by refusing to characterize the assets as his separate property and instead, treating them as part of the marital estate. While George had a difficult burden of proof, the burden to prove assets are separate is not a burden impossible to sustain.[53]

We have examined the 472-page exhibit volume from the first part of the trial in December 2017 and the 912-page exhibit volume from the second part of the trial in June 2018. The exhibits merely document George's failure to meet his burden of proving what parts of the above-listed accounts originated in and should remain

---

[51] *Graves v. Tomlinson*, 329 S.W.3d 128, 139 (Tex. App.—Houston [14th Dist.] 2010, pet. denied).

[52] *Boyd*, 131 S.W.3d at 612.

[53] *See Tarver v. Tarver*, 394 S.W.2d 780, 783 (Tex. 1965); *Latham v. Allison*, 560 S.W.2d 481, 484 (Tex. Civ. App.—Fort Worth 1977, writ ref'd n.r.e); *Martin v. Martin*, 759 S.W.2d 463, 466 (Tex. App.—Houston [1st Dist.] 1988, no writ).

characterized as separate property. Because George failed to meet his burden to establish the origin of the assets that were in the accounts and to establish what parts were separate and what parts were community property after he commingled the assets he inherited with property owned by the marital estate, we hold the trial court did not abuse its discretion by characterizing the accounts as community property the coupled owned as part of their marital estate.[54] We overrule George's third issue.

---

[54] *See McKinley v. McKinley*, 496 S.W.2d 540, 544 (Tex. 1973) (affirming trial court's ruling characterizing assets in an account as community property when the party failed to meet his burden to show that the property was acquired as separate property); *Mock v. Mock*, 216 S.W.3d 370, 373 (Tex. App.—Eastland 2006, pet. denied); *Boyd*, 131 S.W.3d at 612 (husband failed to present specific tracing testimony or corroborating testimony or evidence of nature of real and personal property); *Ganesan v. Vallabhaneni*, 96 S.W.3d 345, 354 (Tex. App.—Austin 2002, pet. denied) (husband's testimony failed to establish the accounts at issue were separate property because his testimony and exhibits failed to "provide account numbers, statements of accounts, dates of transfers, amounts transferred in or out, sources of funds or any semblance of asset tracing"); *Osorno v. Osorno*, 76 S.W.3d 509, 512 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (husband's testimony insufficient to overcome community presumption in absence of deposit slips or bank records tracing source of funds); *Bahr v. Kohr*, 980 S.W.2d 723, 728-29 (Tex. App.—San Antonio 1998, no pet.) (wife's testimony failed to establish property she claimed as separate property was owned by her as separate property because she failed to produce evidence sufficient to establish she bought the property with money that was her separate property); *Robles v. Robles*, 965 S.W.2d 605, 616 (Tex. App.—Houston [1st Dist.] 1998, pet. denied) (husband's testimony insufficient to overcome community presumption when husband testified only as to separate nature of property in dispute, but provided no supporting documents tracing the funds that he used to purchase property); *Latham,* 560 S.W.2d at 485 (left to conjecture about the source of the funds, the appellant failed to create a record sufficient to allow the court to trace the property).

Division of the Marital Estate

In issue four, George argues the trial court abused its discretion when it divided the marital estate because it considered fault "as a basis for awarding a disproportionate share of [the] community property to [Kathryn]." According to George, the trial court erred by considering fault in dividing the parties' marital estate because the court granted the divorce "on the ground of insupportability[,]" a no-fault ground for dissolving their marriage.[55]

But George failed to preserve these arguments for our review in his appeal. First, George never objected when he was in the trial court when Kathryn introduced evidence supporting her claim that he was at fault in causing the divorce.[56] And even when the trial court issued its written findings, including a finding that George was at fault in causing the divorce and that his fault justified an unequal distribution of the marital estate, George never objected to the findings by complaining in a post-judgment motion or a hearing by pointing out his claim that the trial court erred by

---

[55] Tex. Fam. Code Ann. § 6.001 ("On the petition of either party to a marriage, the court may grant a divorce without regard to fault if the marriage has become insupportable[.]").

[56] For instance, in closing George's attorney argued: "At the end of the day both parties did accuse each other of fault." Shortly after that, George's attorney argued: "And at this point, at the conclusion of the trial we believe that Ms. Danner did not prove that Mr. Danner was at fault at all in this divorce. To the contrary, we believe that Mr. Danner proved that Ms. Danner was at fault in the divorce."

considering fault and then granting the divorce on a no-fault ground. By failing to raise these objections in the trial court, George failed to give the trial court a chance to address his complaints. As a result, he cannot now rely on these arguments in his appeal.[57]

Second, even had George objected to the findings, George still needed to secure fact findings from the trial court that assessed the values of the various assets of the marital estate to establish the trial court's division of the couple's property is so disproportionate that it does not constitute a just division of the parties' marital estate.[58] Without such findings, the only values in the record before us for the various assets are the values George placed on them in his inventory. Kathryn's inventory, even if she filed one, is not in the appellate record. But even when we look to the values George assigned to the assets the trial court divided in dividing the marital estate, the trial court awarded George around 54% of the assets the trial court found were owned by the marital estate. Even were we to use the values George placed on the assets at issue, he cannot show the trial court forced a division on him that is not just or right.[59]

---

[57] Tex. R. App. P. 33.1(a)(1); *Felix-Forbes v. Forbes*, No. 02-15-00121-CV, 2016 Tex. App. LEXIS 5625, at *12 (Tex. App.—Fort Worth 2016, no pet.).

[58] *See Brown v. Wokocha*, 526 S.W.3d 504, 507 (Tex. App.—Houston [1st Dist.] 2017, no pet.).

[59] *Id.*

32

We hold that by failing to secure findings on the value of the marital assets, George cannot now show the trial court signed a judgment that gave him an unfair share in the couple's marital estate.[60] Because George cannot show the trial court's error caused the trial court to render an improper verdict, his fourth issue is overruled.

## Attorney's Fees

In his last issue, George relies on three arguments to overturn the various attorney's fee awards in the trial court's final judgment. First, George argues the evidence is insufficient to support the awards. Second, he claims the awards violate public policy, suggesting the evidence in the trial established that Kathryn's agreement to pay fees is one that hinged on the outcome of the trial. And third, George argues the trial court erred by failing to make its awards of attorney's fees conditional on George losing should he fail to succeed in an appeal.

As part of the trial court's duty to make a just and fair division of a couple's marital estate, trial courts may award attorney's fees to a spouse.[61] In dividing the

---

[60] Tex. R. App. P. 44.1(a) (providing that no judgment in a civil case may be reversed on appeal unless the appellate court concludes the error properly caused the rendition of an improper judgment).

[61] *Murff,* 615 S.W.2d at 699; *Wilson v. Wilson*, 44 S.W.3d 597, 599-600 (Tex. App.—Fort Worth 2001, no pet.); *Austin v. Austin*, 619 S.W.2d 290, 292 (Tex. App.—Austin 1981, no writ).

marital estate, the trial court may choose to award a reasonable fee, but if the court chooses to do so, it must make the award of fees conditional on the outcome of the losing party's failure to prevail upon exercising the right to appeal.[62]

Questions about the amount that a trial court awarded for a party's attorney's fees are treated as questions of fact.[63] Thus, the party seeking an award for attorney's fees must support the claim with evidence sufficient to establish the amount of a reasonable and necessary fee.[64] But the evidence the party needs in many cases may consist of no more than the testimony of the attorney that represented the party seeking the award.[65] In deciding what amount is reasonable and whether the work was necessary, the factfinder may consider any factors relevant to the representation,[66] including the eight factors identified by the Texas Supreme Court in *Arthur Andersen and Company v. Perry Equipment Corporation*.[67]

---

[62] *In re Ford Motor Co.,* 988 S.W.2d 714, 721 (Tex. 1998).
[63] *See Ayala v. Ayala*, 387 S.W.3d 721, 733 (Tex. App.—Houston [1st Dist.] 2011, no pet.).
[64] *Id*.
[65] *Id*.
[66] *Hoover Slovacek LLP v. Walton*, 206 S.W.3d 557, 561 n.7 (Tex. 2006).
[67] The eight *Arthur Anderson* factors require trial courts to consider the following when awarding attorney's fees:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;

Kathryn's attorney testified about the fees he charged Kathryn after she hired him to assist her with her divorce. During his testimony, the attorney described the various hourly rates his firm charged Kathryn for the work the firm performed for her on her divorce. He described why he thought the case involved issues that he considered complex. The record includes the firm's itemized invoices, which the trial court admitted into evidence in the trial. The itemized bills describe the tasks

---

(2) the likelihood…that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

*Arthur Andersen & Co. v. Perry Equip. Corp*., 945 S.W.2d 812, 818 (Tex. 1997) (citing Tex. Disciplinary R. Prof'l Conduct R. 1.04(a)).

the firm performed, the dates individuals in the firm performed the work, and the initials of the person who performed each task. Kathryn's attorney testified that $147,245 represented a reasonable award for the work the firm did through June 21, 2018. He then testified that Kathryn had incurred and would incur another $15,000 in fees between June 21 and the date the trial court signed the final decree. Then, the attorney addressed the appellate fees he projected Kathryn could incur should George appeal. According to the attorney, he thought Kathryn would incur $40,000 in new fees should George appeal to the court of appeals, $5,000 more should George seek to have the decision of the intermediate appellate court reviewed by the Texas Supreme Court, and $15,000 more should the Texas Supreme Court grant a petition for review. According to the attorney, the fees he described were "reasonable and necessary for matters of this sort[.]"

When George's attorney asked if the charges he described depended on the outcome of the case, the attorney testified: "No. She owes me no matter what." George did not call any witnesses to dispute the attorney's testimony about the fees.

In the judgment, the trial court awarded Kathryn $60,000 in attorney's fees for the work Kathryn's attorney performed through the date the court signed the

decree,[68] $40,000 should George purse an appeal to an intermediate court, $5,000 more in appellate fees should George file a petition for review, and another $15,000 in appellate fees conditioned "upon acceptance of the appeal by the" Texas Supreme Court.

Although George argues the testimony of a party's attorney is legally insufficient to support a trial court's award of attorney's fees, he cites no cases to support his argument. He's also mistaken. Under Texas law, the trier of fact may choose to award one of the party's attorney's fees based solely on the testimony of the attorney who represented the party who has asked the trial court to award a reasonable amount in fees.[69] Here, the record contains the testimony of a licensed attorney addressing the reasonableness and need for the fees that Kathryn incurred in her divorce. Except for claiming the testimony of the attorney cannot raise a fact issue to support an award of fees, George offers no other arguments to support his claim that the evidence is insufficient to support the award.

---

[68] The award of fees through the date of judgment accounts for interim awards that George agreed to pay over in earlier stages of the case. In a mediated settlement agreement, George agreed to pay and had paid $13,000 of Kathryn's attorney's fees. In a temporary order, George agreed to pay and had paid $59,000 of Kathryn's attorney's fees.

[69] *Vazquez v. Vazquez*, 292 S.W.3d 80, 86 (Tex. App.—Houston [14th Dist.] 2007, no pet.); *Peeples v. Peeples*, 562 S.W.2d 503, 506 (Tex. Civ. App.—San Antonio 1978, no writ) (citing *Boysen v. Sec. Lumber Co.*, 531 S.W.2d 454, 457 (Tex. Civ. App.—Houston [14th Dist.] 1975, no writ)).

Next, George claims the award of attorney's fees violates public policy because the evidence in the trial shows that Kathryn's agreement to pay fees turned on the outcome of the trial. George is mistaken about what the evidence shows, so we need not discuss his theory that asserts the trial court violated public policy by finding Kathryn was entitled to an award of fees. The evidence admitted at trial includes the employment agreement Kathryn signed with the firm that represented her in her divorce. The employment agreement requires Kathryn to pay the firm hourly rates "for the legal services of the law firm." Nothing in the agreement shows the obligation Kathryn incurred to pay fees hinged on the outcome of the trial. Instead, the agreement states all invoices the firm sends are "due within ten (10) days of receipt." And as we have already pointed out, Kathryn's attorney testified Kathryn's obligation to the firm did not turn on the outcome of the trial.

While it's true that Kathryn and her attorney testified that they didn't know how Kathryn could pay the fees should George prevail in the trial, that testimony cannot reasonably be construed to mean that she is not legally obligated to pay the charges the attorney testified the firm charged her in the trial. Even should Kathryn not pay what she owes the firm that represented her in the divorce, the written agreement she has to pay the debt does not depend on the outcome of the trial.

Last, George argues the trial court erred by failing to make his obligation to pay the appellate fees contingent on his losing his appeals. Generally, trial courts cannot require a party pay appellate fees unless they make the payment of them conditional on the outcome of the party that appealed losing the appeal.[70] That rule makes sense, since the courts should not issue judgments that penalize a party when the party that appeals succeeds in reversing the court's judgment.[71] But George did not prevail on the merits of his appeal in this Court. As a result, to that extent the trial court failed to condition the awards on George losing the appeals in this Court, we hold the error was harmless.[72]

That said, we agree with George the trial court erred by failing to make the appellate fees should he pursue an appeal in the Texas Supreme Court conditional on George losing at that stage of his appeal. To that limited extent, we sustain George's fifth issue. Thus, the judgment must be modified to reflect that Kathryn can recover appellate fees should George appeal to the Texas Supreme Court only if

---

[70] *Messier v. Messier*, 458 S.W.3d 155, 170 (Tex. App.—Houston [14th Dist.] 2015, no pet.).

[71] *In re Ford Motor Co.*, 988 S.W.2d at 721.

[72] *See* Tex. R. App. P. 44.1(a) (harmless error); *Tex. Farmers Ins. Co. v. Cameron*, 24 S.W.3d 386, 401 (Tex. App.—Dallas 2000, pet. denied) (explaining the trial court's failure to make appellate fees conditional on the outcome "is harmless if an appellant has been ultimately unsuccessful in its appeal").

George does not succeed at each stage of the proceedings should he appeal from this Court's judgment.[73]

## Conclusion

Having overruled most of George's issues, we affirm the trial court's judgment except for two of the awards, the awards that addressing the attorney's fees the trial court awarded should George appeal to the Texas Supreme Court. Because we have sustained George's fifth issue in part, we modify the decree in two ways. First, we modify the final judgment by making the trial court's award of $5,000 in appellate fees contingent on the Texas Supreme Court's issuing an order denying George's petition for review. Second, we modify the trial court's judgment to make the trial court's award of $15,000 in appellate fees should George appeal to the Texas Supreme Court contingent on George losing his appeal and the Texas Supreme Court granting his petition for review. As modified, the trial court's judgment is affirmed.

AFFIRMED AS MODIFIED.

_____
HOLLIS HORTON
Justice

Submitted on November 19, 2019
Opinion Delivered October 29, 2020
Before McKeithen, C.J., Horton and Johnson, JJ.

---

[73] Tex. R. App. P. 43.3.